FIRST TEACHERS INVESTMENT CORPORATION, ET AL, 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent First Teachers Inv. Corp. v. CommissionerDocket Nos. 2485-76, 2486-76, 2487-76.United States Tax CourtT.C. Memo 1980-302; 1980 Tax Ct. Memo LEXIS 284; 40 T.C.M. (CCH) 892; T.C.M. (RIA) 80302; August 7, 1980, Filed *284 Nathan Lewin,Jamie S. Gorelick and Robert D. Grossman, Jr., for the petitioners. Frank J. Coyne, Jr., for the respondent. IRWINMEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies and additions to tax pursuant to section 6653(a) 2 as follows: 3DocketSec. 6653(a)Tax YearNo.PetitionersDeficiencyPenaltyEnded2485-76First Teachers Investment$ 468.41$ 23.429-30-65Corporation736.3036.829-30-66645.9232.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,621.48731.079-30-682486-76Teachers Finance Company672.4733.625-31-65249.7312.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,315.651,215.785-31-67206,695.8910,334.795-31-682487-76Leslie W. Nimmo & Betty58,942.812,947.1412-31-64P. Nimmo9,483.17474.1612-31-65119,712.415,985,6212-31-66166,753.728,337.6912-31-67596,951.2029,847.5612-31-68Due to concessions the following issues remain for our consideration: (1) whether petitioners, First Teachers Investment Corporation and Teachers Finance Company, properly deducted as worthless debts in their fiscal years ending September 30, 1965 and May 31, 1965, respectively, *285 amounts loaned for use in the Mexican project; (2) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to a capital loss in 1964 and 1967 for payments Leslie W. Nimmo made to Delta Development Corporation or to Land, Inc., and Flint, Inc., pursuant to his guarantees of loans which these corporations made for use in the Mexican project; (3) whether petitioners, Leslie W. and Betty P. Nimmo, properly deducted as a fraud loss in 1965 and 1966 payments Leslie W. Nimmo made to Land, Inc., and Flint, Inc., pursuant to his guarantees of loans these corporations made for use in the Mexican project; (4) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to a short-term capital loss in 1968 upon Leslie W. Nimmo's payment of loans made by Great States Life Insurance Company to certain Georgia corporations for use in the Mexican project and which Nimmo guaranteed as part of the sale of Great States Life Insurance Company to State Security Life Insurance Company; (5) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to increase their basis in stock of Great States Life Insurance Company for certain legal fees paid on the sale of their stock; (6) whether petitioners, *286 Leslie W. and Betty P. Nimmo, received dividend income in 1968 of $469,289 and $53,204 from Teachers Finance Company and First Teachers Investment Corporation, respectively; (7) whether petitioners, Leslie W. and Betty P. Nimmo, received a dividend of $15,000 in 1964 and $35,000 in 1966 from Monroe Chemical Co., on loans it made to Teachers Finance Company and whether petitioners, Leslie W. and Betty P. Nimmo, received interest income of $750 in 1965 and 1966 and $2,500 in 1967 and 1968 upon payment by Teachers Finance Company of the interest due on the Monroe Chemical Co. notes; (8) whether petitioner, Teachers Finance Company properly deducted interest in 1967 of $4,000 and in 1968 of $2,500 payable to Monroe de Mexico; (9) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to interest deductions of $4,155 in 1967 and $3,290 in 1968 for certain payments to Henry Awbrey; (10) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to interest deductions of $600 in 1967 and $475 in 1968 for certain payments to Pearson Wade; (11) whether petitioners, Leslie W. and Betty P. Nimmo, properly recognized a loss in connection with the liquidation of Nimmo & Associates. *287 Resolution of this issue depends upon the adjusted basis Leslie W. Nimmo had in his stock of Nimmo & Associates; (12) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to deduct $3,281 in 1967 for interest accrued on a promissory note executed in favor of Henry Kyle; (13) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to a $25,000 loss under either section 165(c)(2) or 165(c)(3) for funds advanced to Samuel Klurman to secure equity capital for Nimmo & Associates; (14) whether the transfer of Horace Mann Insurance Co. stock by petitioner, Leslie W. Nimmo, to George Rule in 1965 was a bona fide sale; (15) whether interest income was understated by petitioner, Teachers Finance Company, in the amount of $38,010 in each of its fiscal years here in issue as a result of loans it made for use in the project; (16) whether interest income was understated in 1968 by petitioner, Teachers Finance Company, because of its accounting treatment of two bonds it purchased in 1968; (17) whether petitioner, Leslie W. Nimmo, properly reported his gain on the sales of his Horace Mann Insurance Co. stock in each of the taxable years 1966, 1967, and 1968; (18) whether petitioners, *288 Leslie W. and Betty P. Nimmo, received dividend income of $112,140 in 1968 from Greenlake, Inc.; (19) whether petitioner, Leslie W. Nimmo, received $1,000 of unreported income in salaries and wages in 1964 from Horace Mann Insurance Co:, (20) whether petitioner, Leslie W. Nimmo, has substantiated, pursuant to section 274(d), certain alleged business travel and entertainment expenses claimed in 1964 and 1965; (21) whether petitioners, Leslie W. and Betty P. Nimmo, received $1,000 income on the liquidation of Horace Mann Investors in 1964; (22) whether petitioners, Leslie W. and Betty P. Nimmo, received unreported income from an insurance agency of $5.20 in 1965 and $111.68 in 1966; (23) whether petitioners, Leslie W. and Betty P. Nimmo, are entitled to a deduction of $18,833.38 for interest payments to Teachers Finance Company in 1968; (24) whether petitioners, Leslie W. and Betty P. Nimmo overstated their 1966 interest deduction by $82 with respect to Horace Mann Retirement Fund and/or whether they received annuity income of $250 in 1966; (25) whether petitioners, Leslie W. and Betty P. Nimmo, received interest income of $500 in 1968 from State Security Life Insurance Company; (26) *289 whether petitioner, Teachers Finance Company, properly accrued interest expense payable to petitioner, Leslie W. Nimmo, in each of its fiscal years ending 5/31/65, 5/31/66, 5/31/67 and 5/31/68 of $8,632.06, $10,112.10, $10,633.45, and $8,547.09, respectively; (27) whether petitioner, First Teachers Investment Corporation had unreported interest income of $1,500 in its fiscal year ending 9/30/65; (28) whether petitioner, Leslie W. and Betty P. Nimmo received income of $65,000 from Putnam Dyes, Inc.; (29) whether petitioners, Leslie W. and Betty P. Nimmo incurred interest expense of $1,400 in 1967 paid to First Teachers Investment Corporation; and, (30) whether any or all of petitioners were negligent in preparing their returns. FINDINGS OF FACT GeneralSome of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, First Teachers Investment Corporation (hereafter First Teachers) and Teachers Finance Company (hereafter Teachers Finance), are corporations incorporated under and pursuant to the laws of the State of Illinois. First Teachers filed its Federal corporate income tax returns *290 using the cash method of accounting for its fiscal years ending September 30, 1965 through September 30, 1968, with the District Director of Internal Revenue at Springfield, Illinois. Teachers Finance filed its corporate income tax returns using the accrual method of accounting for its fiscal years ending May 31, 1965 through May 31, 1968 with the District Director of Internal Revenue at Springfield, Illinois. Petitioners, Leslie W. and Betty P. Nimmo, 4 husband and wife, filed their joint income tax returns for the taxable years 1964 through 1968 at the Kansas City Service Center. During the years in issue, the Nimmos resided in Springfield, Illinois.Nimmo filled out the Nimmos' tax returns himself without consulting an accountant or attorney. Teachers Finance was organized in 1953 by Nimmo with an initial capital investment of $20,000. Nimmo owned all of its common stock but sold preferred stock to teachers in Illinois. The company was a holding company which invested in securities and made loans of various kinds. First Teachers was a companion company to Teachers Finance and engaged in similar activities. Nimmo also *291 owned all of First Teachers' common stock and sold preferred stock to teachers in Illinois. Most of the corporations' books and records were in Nimmo's own handwriting and Nimmo prepared the income tax returns for both corporations. Mexican ProjectDuring 1960, James Windham, and attorney, solicited investors, including petitioners, to finance construction of a golf course project and resort complex in or around Cuernavaca, Mexico (hereafter the project). At one point prior to the ultimate failure of the project, Windham was a wealthy man with one of the finest law practices in Mexico City, a practice which he had built over a period of twenty-five years. Windham had offices and clients in Mexico City, New York, Chicago, Washington, D.C., Los Angeles, San Antonio, London, Tokyo, Paris, Dusseldorf, and Buenos Aires. At all times, Windham viewed the project as his personal project and considered Nimmo a creditor of the project corporations. The initial idea for the project was Windham's and during 1960, Windham told Nimmo (who was a client of Windham's) tht land could be purchased in Mexico on which a hotel could be built. Nimmo decided to invest in the project. On September *292 20, 1960, Windham incorporated Fomento y Consejo Industrial y Commercial (hereafter Commercial) in Mexico to hold and develop the real property of the project. Apparently, however, Windham did not put the property in Commercial's name but rather placed it in the names of three attorneys in his law office as trustees for the corporation. Windham also formed another corporation in Mexico, Inmobiliaria Monte Castillo (hereafter Castillo), with the agreement of Nimmo, in order to hold lands transferred from other attorneys in Windham's office for use in the project. A third corporation, Club de Golf Monte Castillo, was formed in connection with the project to either buy or lease the golf course, thereby leaving the remaining property to be subdivided by Commercial into lots and sold to the public. Windham was in complete charge of all management decisions in connection with the construction and administration of the project and of its day-to-day operations. Windham was a full-time resident of Mexico and was the only person recognized under Mexican law to sign documents on behalf of the project. During the early years of the project its books and records were maintained at Windham's *293 law office in Mexico City. Periodically, Windham would write Nimmo regarding the project and in March 1963, Nimmo requested weekly status reports. Nimmo occasionally traveled to Mexico to look after various interests he had there, including the project. Initially, both Windham and Nimmo agreed to invest in the project and Nimmo purchased 49 percent of Commercial's stock with Windham retaining the remaining 51 percent equity. Originally, the total expected capitalization was to be about $500,000. In response to Windham's request for funds for the project, Nimmo sent Windham a personal check for $87,678.66 on October 19, 1960. Previously, on March 4, 1960, Nimmo agreed that Windham should apply to the project $100,000 which Windham had owed him in regard to a previous deal that had fallen through. Windham later determined that additional capital was needed in order to improve the corporations' ability to obtain financing. Nimmo, however, told Windham that he could not participate as an owner in the project because he did not have additional capital to invest. In response, in January 1961, Windham proposed the return of the stock in order to obtain additional capital and the following *294 month Nimmo returned his stock and became a creditor 5*295 of Commercial. By letter dated February 23, 1961, Nimmo and Windham agreed that Windham would give Nimmo a promissory note in the amount of $310,000 due October 20, 1962 and guaranteed by a first mortgage on project land and by all of Commercial's stock. Windham also indicated at that time that he was interested in borrowing money from two insurance companies in which Nimmo owned the controlling shares, Great States Life Insurance Company (hereafter Great States) and Horace Mann Life Insurance Company (hereafter Horace Mann). Nimmo told Windham that he would attempt to obtain loans from these companies. He added that it might be necessary for the companies to retain as security for the loans shares of Commercial. Windham did, in fact, make an application for a loan in late April 1961. Application had been delayed, according to letters Windham wrote Nimmo, due to delays in obtaining deeds to the land to be used in the project (over 1,000,000 square meters). The project never had clear title to the land. Nimmo, however, believed that Windham had actually purchased this land. Windham also expected to purchase an additional 1,000,000 square meters. The application for the loan was for $200,000 for one year at prevailing market rates. The loan was to be used for improvements on the property. Windham also enclosed with the application all of the stock of Commercial as well as its certified financial statement in which it was stated that the stock represented $1,200,000 of paid-in capital. Nimmo later discovered that Windham had not in fact invested this amount of capital and that there was not nearly $1.2 million in paid-in *296 capital in Commercial. Windham had apparently invested most of his assets in running the project, however, and eventually lost most of his personal wealth in doing so. Great States approved the loan to be made in two installments of $100,000 each. On June 16, 1961, Windham wrote Nimmo indicating that he and Nimmo were to meet on July 1 and that he hoped by the time of the meeting he would have either completed the land purchases for the project or be very close to completing them. In July 1961, Windham told Nimmo that the project needed an advance of $80,000 so that he would have sufficient funds on hand to complete the project. Windham also authorized Nimmo to allocate a number of shares of Commercial's stock among himself and the other petitioners as security for any advances made by them or Great States previously as well as in the future. In August, Windham obtained an $80,000 loan from First Teachers evidenced by a promissory note signed by Windham bearing 7 percent interest and due in one year. The note was recorded on First Teachers' books as a note receivable. At Windham's request, additional funds were forwarded to him in Mexico by Nimmo for use in the project. Payments *297 were made by First Teachers and Teachers Finance in the form of checks drawn to Windham. On each occasion, Windham personally signed a promissory note obligating himself to repay the two corporations the principal, plus 7 percent interest, pursuant to a repayment schedule. The following table sets forth the advances made by First Teachers and Teachers Finance and Nimmo and repayments: FIRST TEACHERS INVESTMENT CORPORATIONDateTransferorTransferee/Payee8/29/61First Teachers InvestmentJames B. WindhamCorporationCumulative Amt. Lent by& Owed to First TeachersDateAmountInvestment Corp.8/29/61$ 80,000$ 80,000TEACHERS FINANCE COMPANYDateTransferorTransferee/Payee10/21/59Teachers FinanceBufete James B. WindhamCompanyTrustee Account11/30/59Teachers FinanceBufete James B. WindhamCompanyTrustee Account?/?/60James B. WindhamTeachers FinanceCompany11/21/61Teachers FinanceJames B. WindhamCompany12/29/61Teachers FinanceJames B. WindhamCompany3/27/62Teachers FinanceJames B. WindhamCompany7/23/62Teachers FinanceJames B. WindhamCompany9/10/62Teachers FinanceJames B. WindhamCompany9/19/62Teachers FinanceJames B. WindhamCompany?/?/63James B. WindhamTeachers FinanceCompanyCumulative Amt. LentDateAmountBy & Owed to TFC10/21/59$ 50,000$ 50,00011/30/59$150,000$ 200,000?/?/60$100,000$ 100,00011/21/61$100,000$ 200,00012/29/61$100,000$ 300,0003/27/62$ 15,000$ 315,0007/23/62$ 25,000$ 340,0009/10/62$ 63,000$ 403,0009/19/62$140,000$ 543,000?/?/63$12,321.34$ 530.678.66LESLIE *298 W. NIMMO, INDIVIDUALLYDateTransferorTransferee/Payee10/19/60Leslie W. NimmoJames B. Windham1/2/63Leslie W. NimmoJames B. Windham?/?/63James B. WindhamLeslie W. NimmoCumulative Amt. Lent ByDateAmount& Owed to Leslie W. Nimmo10/19/60$87,678,66$ 87,678.661/2/63$50,000.00$ 137,678.66?/?/63$137,678.66--Several individuals other than petitioners also advanced funds to Windham for use in the project. At some time after August 1961, a political battle with the Mexican government developed regarding legal title to the land Windham had "acquired" for the project. As noted previously, the project, in fact, never had clear title to the land and was claimed as communal land by Indians living in the area. On April 5, 1962, Windham wrote Nimmo acknowledging the $15,000 loan from Teachers Finance obtained on March 27, 1962. In the letter Windham also stated that he had met with town officials, and as a result of his meeting, the final certificates for the land for the project were to be signed within the week by the Director General of the Agrarian-Department in Mexico City. Signing of the final certificates would have meant that the project would own the land without encumbrance and would have *299 title to it free and clear of any claims by the government. Windham stated further that he did not expect to need any more money from petitioners in order to complete the project. On July 14, 1962, however, Windham told Nimmo that he needed another $200,000 for interim financing, and expressed absolute confidence that the additional sums would assure the success of the entire project. Windham also stated that the project was only 90 days from reaching the point where income would begin to flow in; that the water problem had been solved; that title to the land had been perfected; that a highway was being constructed close to the property completely at the expense of the Mexican government; that the golf course had been fully engineered; that the fairways had been laid out; that the greens were then being built; and that within 90 days the first nine holes on the private course would be complete. Two days later, Windham wrote another letter to Nimmo to encourage him to arrange the financing and in which he stated that the provisional roads to the hotel site and into the first residential zone section of the project had been completed. In a postscript Windham stated that Frank Sinatra *300 was going to become a member of the golf and country club. Again, on July 19, 1962, Windham wrote Nimmo and stated that work on the road to the project would begin immediately and that it would be only a short period of time before land values in the area of the project would start to rise. On July 23, 1962, Teachers Finance loaned Windham the first $25,000 of the $200,000 requested on July 14 for use in the project. On July 26, when Windham acknowledged the receipt of the funds, he also indicated that the needed another $25,000 the following week. Windham further stated that he would need the remainder of the $200,000 by the end of August and on August 3, 1962, Windham asked Nimmo to advance the balance of the $200,000 before August 25, 1962. Windham enclosed a purported financial statement of the project with the letter. On September 10, 1962, Teachers Finance loaned $63,000 to Windham secured by a promissory note signed by Windham for use in the project and nine days later loaned an additional $140,000 to Windham also secured by a promissory note which he signed.On September 21, 1962, Windham wrote Nimmo indicating that "there are no further obstacles in our way as we now have *301 the approval of the state of the entire project." In early 1963, Henry Kyle became involved with the project. Kyle had been in the construction business for over 15 years and had had considerable experience in the development of golf clubs. At first, Kyle offered to contribute his services to the project in return for 20 percent of the project's gross revenues, but Windham rejected this offer. Instead, Windham signed an employment contract with Country Club Management, a corporation owned jointly by Kyle and Don Tanner, under which Kyle worked for the project as a consultant. This contract required Country Club Management to work on the project for 200 days during a period not to extend beyond one year and to provide a consultant during that time. When Kyle went to Mexico to work on the project, he met Windham and it appeared to him that Windham was wealthy and successful. On January 3, 1963, Windham borrowed $150,000 from Delta Development Corporation (hereafter Delta) for use in the project and for which he issued a promissory note guaranteed by Nimmo. Delta would not have made the loan without Nimmo's guarantee. Windham never repaid the loan, and as a result, on January 31, *302 1964 Nimmo made payment in full to Delta of $159,750 (including $9,750 interest). This amount was deducted by Nimmo on his 1964 income tax return as "Payment of guarantee of defaulted loan." Respondent disallowed this deduction. Ultimately, Kyle discovered that the project was short of funds and in need of financing. Kyle and Windham felt that by using the Georgia farm of Kyle's father-in-law as collateral they might obtain a substantial loan. Windham also asked Kyle if he knew people in Georgia (where Kyle had family) who would be willing to sell property. At that point (July 1963), Windham called Nimmo and introduced Nimmo to Kyle. Kyle, Nimmo and Windham then instructed Garland Byrd, a Georgia attorney, to form seven corporations in Georgia, Leo, Inc., Greenlake, Inc., Pulaski, Inc., Land, Inc., Tazewell, Inc., Marion, Inc., and Taylor, Inc., all controlled by Kyle, in order to hold Georgia farmland as collateral for additional loans to be obtained for use in the project. The seven separate corporations were set up in order to comply with lending restrictions on Illinois insurance companies and, in June 6 1963, Great States loaned the seven Georgia corporations $933,800 at *303 6-1/2 percent interest, secured by mortgages on property held by the corporation. 7 The properties were over-appraised by Kyle, with Nimmo's knowledge, and the loans that were obtained from Great States were far in excess of the fair market value of the properties. Later, on December 31, 1966, a routine audit was begun of Great States by the Illinois Department of Insurance (hereafter Department) to examine and established the financial condition of Great States and to insure that it's method of operation complied with the law. Even *304 prior to the audit, however, the Department had become concerned with the company's mortgage loan portfolio because of the loans to the Georgia corporations and a collateral loan to George Rule, Nimmo's nephew, which was a conflict of interest and could not be valued for financial statement purposes. In addition, the Department considered the various loans to be one loan and that the farms had been placed into separate corporations to avoid a restriction which prohibited an insurance company from lending over 2 percent of its assets in any one mortgage loan. Nimmo was told that the Department considered entering an order of conservation under which the Director of Insurance would, under court order, manage Great States' control of its assets and conduct its business. Nimmo was also told that the insurance examiners had been sent to Georgia to appraise the farms and had concluded that the loans were greatly in excess of their fair market value. On July 15, 1963, Land, Inc., on behalf of the Georgia corporations, loaned Windham $500,000 of the $933,800 borrowed from Great States. This loan was at 6-1/2 percent interest. Kyle had refused to advance the funds to Windham, however, *305 unless the note was guaranteed by Nimmo. Therefore, the loan was guaranteed by a promissory note in the amount of $500,000 from Nimmo to Windham and endorsed by Windham to Land, Inc. Sometime after this date, substitute notes were signed by Windham and Nimmo to reduce the annual obligation under the terms of the first note, although the total obligation of Windham to Land, Inc. remained at $500,000. By letter dated August 23, 1963, Windham acknowledged receipt of Nimmo's note payable to Windham's order in the amount of $500,000, dated July 15, 1963. Immediately upon receipt of the $500,000, Windham flew to California to deposit it in the Bank of America. Simultaneously with his depositing the funds, Windham took out a $500,000 "counter-balancing" loan secured by the initial deposit. On August 15, 1963, from this $500,000 Windham repaid Nimmo $137,678.66 and Teachers Finance $12,321.34, since Nimmo had been pressing for at least partial repayment. Nimmo did not know that the total of $150,000 repaid was from the proceeds of the Land, Inc. loan. The remainder of the $933,800 loaned by Great States to the Georgia corporations in June was apparently used to purchase the properties *306 collateralizing the loans. At the end of October 1963, Nimmo Flew to Mexico City because of the project's financial problems. Also in October, Great States loaned Flint, Inc., another corporation holding land in Georgia, $620,000 secured by mortgages on its property. This corporation, like the earlier Georgia corporations, was controlled by Kyle. After obtaining this loan, Flint, Inc., loaned $480,000 at 6-1/2 percent interest to Windham to be used in the project.Repayment of $332,300 of this amount was guaranteed by a promissory note by Nimmo to Windham and endorsed by Windham to Flint, Inc. Repayment of the additional $147,700 was guaranteed by a promissory note to Flint, Inc., signed only by Nimmo. Windham never received the money personally. Instead, the proceeds of the loan were disbursed from time to time by Kyle for the benefit of the project. 8*307 Nimmo and Windham signed an agreement dated October 30, 1963, in which Windham transferred all the stock in Commercial and Castillo to Nimmo in order to induce Nimmo to guarantee further loans to the project. As of that time Nimmo had either loaned to Windham or guaranteed payment of loans to Windham of $1,238,000 of which $150,000 had been repaid on August 15, 1963, leaving a balance of $1,088,000, plus interest. Of this amount $350,000 was overdue and neither Windham nor the Mexican corporations could make repayment. Nimmo was to have the right to use the stock in any manner he chose to protect his loans and when all of the loans were repaid, Nimmo was to share with Windham any profits in proportion to the amounts invested by each. 9At around midnight on the same day (October 30, *308 1963), Windham left Mexico City and abandoned management of the project. This left Kyle and Nimmo as the only people to act on behalf of the project. Windham did not explain to Nimmo his reasons for leaving, nor had he told either Kyle or Nimmo that he was going to leave. One reason for his departure was pressure from Mexican nationals on matters unrelated to the project. Other reasons were that both creditors of the project and the Mexican police frequently came to his office and Windham did not desire to see them. In fact, at the time he left Mexico, two creditors were demanding payment of their loans to Windham and Windham could find no way to satisfy the obligations. When Windham left Mexico, he left unpaid obligations totaling approximately $2,374,930 (undertaken for the project).It was not until this time that Nimmo discovered the large number of creditors who had claims against Windham.Since his departure from Mexico, Windham has been unable to repay any of the funds loaned him for use in the project and neither he nor any of the Mexican corporations comprising the project have the financial ability to repay either First Teachers or Teachers Finance. On August 23, 1963, *309 Kyle and Nimmo agreed that Nimmo should have complete control of the affairs and assets of the Mexican companies, subject to certain restrictions (primarily that the companies could not incur additional loans or administrative expenses without Kyle's approval). Kyle was also to receive 10 percent of the companies' revenues. Moreover, after all the companies' debts had been repaid, Kyle was to receive an additional 10 percent of revenues in the event he was able to obtain an additional $500,000 loan for the companies (on similar terms to the $500,000 loan Land, Inc. had made to Windham). Despite the advances made by petitioners, and Windham's assurances, the project ran out of money. From January 21 through January 23, 1964, Pedro del Villar, a Mexican attorney, visited Windham in California and reviewed with him the names of all the creditors and the extent of the balances due them in connection with the Mexican project. Along with other attorneys retained by Nimmo in hopes of salvaging the project, del Villar told Nimmo that the only asset of consequence owned by the project was approximately 600 acres of land which had value only if developed into a golf club and subdivided *310 into building lots. He also noted that if the corporations were placed into bankruptcy the general creditors' claims would be practically worthless because the land would be taken by the preference creditors. 10 Accordingly, it was advised that a new investor with sufficient capital to complete the project should be brought in. In January 1964, Alvin Jackson, an attorney in the law firm of Goodrich, Dalton, Little & Riquelme (hereafter Good-rich, Dalton) wrote Irving Bennett, one of the major creditors of the project corporations, noting that the creditors had been trying to reach an agreement to avert a possible bankruptcy. In Jackson's opinion, if bankruptcy occurred, the creditors would realize only 20 percent on their obligations but if an agreement could be reached and the project saved, a complete recovery might become possible. In this letter, and in several other letters, Jackson refers to Nimmo as an investor and notes that Bennett is one of the two largest creditors. In a later letter, however, written in June 1964, Jackson wrote Bennett that Nimmo was, in fact, a creditor and that some recovery *311 of Bennett's debts seemed possible. In March 1964, Nimmo's attorneys set forth to him proposals to salvage the project or complete steps which would enable the project to sell its land. Through March and the first part of April, attempts were made to reach a settlement with the creditors. In April, the various creditors of the project set forth a proposed agreement to salvage the project and protect it from bankruptcy. This agreement included Nimmo as a creditor. It fell through, however, apparently because not all creditors would sign the agreement. Efforts continued, but a final settlement could not be reached with the creditors through 1964. Without this agreement, no additional money could be obtained to complete the project. Throughout 1964 and into 1965, Nimmo and Kyle maintained the project and Kyle advanced $2,700 per month (with Nimmo's approval) out of the $480,000 Flint loan to keep security guards and to continue other maintenance functions as well as to pay legal fees incurred in attempting to obtain title to the land and reach a creditors' agreement. Additionally, Nimmo was incurring interest expenses of over $10,000 per month on the loans he had guaranteed or *312 was paying off. Also, in 1964, Kyle demanded payment on the 1963 loans made to Windham by Land, Inc. and Flint, Inc. and guaranteed to Nimmo. Both the $500,000 obligation to Land, Inc. and the $480,000 obligation to Flint, Inc. were then repaid by Nimmo (since Windham could not make payment on the note) between 1964 and 1967. The following obligations to Land, Inc., was repaid by Nimmo according to the following schedule: DatePayeeAmount19644/3/64Land, Inc.$90,271.0019657/15/65Henry Kyle$ 8,291.7111/3/65Land, Inc.$99,317.97TOTAL 1965$107,609.6819668/8/66Henry Kyle$ 7,232.4011/2/66Land, Inc.$99,317.97($99,312.50 stockplus $5.47 cash)TOTAL 1966$106,550.37196712/30/67Great States$298,308.96TOTALDatePrincipalInterest19644/3/64$57,771.20$32,499.8019657/15/6511/3/65$78,918.73$28,690.9519668/8/6611/2/66$82,885.30$23,665.07196712/30/67$280.424.77$17,884.19$500,000.00$102,740.01The $480,000 obligation to Flint, Inc., was repaid by Nimmo according to the following schedule: DatePayeeAmount19648/21/64Kyle$32,118.2410/15/64$18,251.3810/15/64$11,932.79TOTAL 1964$62,302.91 *196511/3/65Flint, Inc.$65,942.40196611/2/66Flint, Inc.$65,941.60(65,940.00 instock; $1.60 incash)196712/30/67Great States$397,803.65TOTAL*313 DatePrincipalAmount19648/21/6410/15/6410/15/64$31,165.70$31,137.21196511/3/65$36,493.31$29,449.09196611/2/66$39,139.40$26,802.20196712/30/67$373,202.09$24.601.56$480,000.50$111,990.06The amounts paid by Nimmo on the Land, Inc. and Flint, Inc. notes in 1964 and 1967 were deducted by Nimmo on his income tax returns as "Payment on Guarantee of Defaulted Loan" with the exception of the October 1964 payment of $18,251.38. 11 In 1965 and 1966, Nimmo deducted his payments on these notes as fraud losses (as the result of alleged fraud on the part of Windham). 12*314 Had Nimmo known that the title to the land had not been perfected, that the capital had not been paid into the corporations, and that there were a large number of other creditors of the project, he would not have guaranteed the loans. Respondent disallowed these deductions. Teachers Finance accrued interest on Windham's obligations to it prior to 1965 (totaling $55,653.07) which it included on its tax returns. During Teachers Finance's fiscal year ending May 31, 1965, Nimmo determined that the note was uncollectible and Teachers Finance deducted as bad debts the $586,331.73 total accrued interest and principal on the loans to Windham. First Teachers also deducted as bad debts the loans to Windham (including, apparently, accrued interest) in its fiscal year ended September 30, 1965. Respondent disallowed these deductions. On March 2, 1965, Nimmo wrote Windham describing his recent trip to Mexico. Although he stated that he has lost hope of recouping any of the funds he sent to Mexico, he also indicated that he was still attempting to clear title to the land. In response, Windham wrote Nimmo, stating: I have friends that have expressed an interest in the purchase of 100 Fairway lots at argound $10,000 each--each lot to have a life membership in the Golf Club in exchange for an equity interest in the overall project provided the titles are registered and *315 the the (sic) project has the full approval of the Governor of the State. On April 1, 1965, Nimmo met with the Secretary of the State of Morelos to discuss the project. The Secretary stated that he felt the property might be expropriated because it was communal land. Nonetheless, he told Nimmo that things could be worked out; that although the work would be "laborious and difficult" Nimmo should initiate action by liquidating the companies and then transferring the lands into a new company. The Secretary also suggested that his son, Alejandro Sanchez (hereafter Sanchez), and attorney, could handle the legal aspects of the transactions. Nimmo became disenchanted with the law firm that had been attempting to obtain title and work out a creditors agreement. Sometime prior to July, he then hired Tomas Baylon of the firm of Goodrich, Dalton to handle negotiations with creditors, dissolution of the companies, etc., and hired Sanchez to attempt to perfect title to the land. On May 17, 1965, Sanchez wrote Nimmo elaborating the action the companies needed to take in order for him to continue with the steps he had been taking to obtain title to the land. On July 2, 1965, Nimmo wrote *316 one of the investors in the project, Jorge Cardona, who was at that time holding title (to the extent the project was able) to the project land: You no doubt are aware that I had come to such a point of discouragement after spending huge sums of money and accomplishing so little that I was ready to throw the whole mess into bankruptcy. The principal reason that I did not do so was because I had been advised by our former legal advisors and others that such an action would cause you and others who had been connected with the project untold troubles and irreparable harm. I am happy that the present outlook has given me encouragement and with new lawyers and new sources of financing of which I am presently aware, we should be able to bring this project to a successful conclusion and recoup a portion of loss which has been suffered by the creditors. On July 19, 1965, Nimmo wrote Barth Walker (one of the project creditors who had threatened to sue) and told him of the progress he had made with Sanchez and the Secretary and that he had employed another attorney to handle negotiations with the creditors, dissolution of the companies, and formation of a new company. He stated further that *317 he expected to have tentative creditors agreements as to the number of shares to be distributed and that he "came away from Mexico feeling that we should now make some progress." On the same day, he also wrote Windham setting forth the same information and telling him that he "would like to talk with [him] by telephone regarding this step of the procedure." On July 30, 1965, Nimmo wrote Goodrich, Dalton: * * * It is imperative that decisions be made in the Monte Castillo matter and that we go forward toward the settlement with creditors at all possible speed. You can see that the interest alone on these obligations is a terrific burden on me. I cannot survive unless progress is made soon. The following items must have attention immediately: 1. a skeleton agreement must be drawn for creditors so that shares in a new corporation can be distributed in exchange for a release. I am ready and willing to assist with the negotiation with creditors as to reaching an agreement as to the amount and nature of their credit. 2. Negotiations must be carried on with the Ministry of Public Works to obtain compensation for lands used for the autopista. 3. The office at Melchor Ocampo 463 should *318 be closed as soon as possible since we do not have the funds with which to pay the rent, telephone and electricity. On August 18, the law firm wrote Nimmo: Our study of the situation, particularly with your being involved in 80% of the credits, indicates to us the absolute necessity of working out a plan whereby you can control future operations, with proper protection for the other creditors, but in such a way that you will have freedom to act. We have had discussions with various lawyers in the office concerning the entire problem, and believe that we do have a solution worked out which will give you the needed control, and yet give the proper protection to other creditors so that they will cooperate in letting you have this control through yourself and your representatives. A memorandum was prepared on August 18, 1965, by Tomas Baylon, in which he stated that in order to reach a creditors agreement, it would be necessary that the Banco del Pais, which held a preferred credit against the project, and several minor creditors be paid off. It was also noted that Nimmo had received an offer of 10,000,000 pesos for the lands as is but had rejected the offer since it represented only *319 a 25 percent recovery of the loans. Through July 1965, Nimmo maintained the project's office and attempted to salvage the project and work out arrangements with creditors. These efforts were unsuccessful, however, and in August 1965, the project office in Mexico City was closed and all employees were discharged. On September 1, 1965, Windham, on behalf of himself, Castillo and Commercial wrote several letters to Nimmo stating that he had transferred to Nimmo, for the benefit of the creditors, all stock in Castillo and Commercial in an attempt to pay off the loans made by Nimmo to Windham or guaranteed by Nimmo for Windham's benefit or for the benefit of the project. Windham stated that the shares tendered represented the total capital of the companies. Another memo was sent to Nimmo from Baylon in September 1965. In it, it was noted that the only assets of the companies were the rights of possession to 600 acres of land. He also reported an expert's opinion that the land was worth between $320,000 to $480,000 and that such value, after further expense to perfect title to the land, represented a recovery (at most) of 11 percent of the outstanding general credits. Continuing, *320 the report stated: With respect to the possibility of obtaining recovery of the credits through promotion of a golf club and real estate subdivision, this expert believes that there would be investors, who for 50% of the profit generated, would be capable of succeeding in the business to the extent that within ten years the creditors might recover a substantial portion of their claims. On October 5, 1965, in response to this memorandum, Nimmo wrote "the creditors of the Mexican Companies organized by James B. Windham." In it he noted that as principal creditor of the project companies he had expended a substantial sum of money to protect the assets and keep the companies out of bankruptcy but that he was unable to furnish further financing. He asked to creditors to establish a fund to cover additional expenses he foresaw as necessary to obtain title to the land and protect the assets, or, if they wished instead to give him an option to purchase their credits, he would attempt to find new investors. Nimmo then proposed a creditors' agreement to induce other creditors to purchase the Banco de Pais note against the project for $65,000 (Banco de Pais thereby losing most of the interest *321 accrued on the loan it made to Windham). In so doing the creditors would inhere to the bank's position and thus prevent it from foreclosing against the project. The other creditors were apparently unwilling to advance additional funds, however, and Nimmo, as the largest creditor, believed he had to purchase the note. Rather than purchase it himself Nimmo desired to have Monroe Chemical Co., one of his wholly-owned corporations, now Putnam Dyes, Inc., acquire the note, since Putnam Dyes had available cash and the terms of the loan were favorable (12 percent interest). Under Mexican law, however, a foreign corporation could not own liens on Mexican property. Nimmo did not want the note in his own name since he was already a major creditor of the project. Therefore, Nimmo had Kermit Eskelsen, a distributor for Putnam Dyes, sign a note to Putnam Dyes for $65,000 to purchase the Banco de Pais note in his (Eskelsen's) name. To carry out the plan, Eskelsen borrowed $65,000 from Putnam Dyes on April 20, 1966, supported by a promissory note with interest. On September 3, 1968, Nimmo purchased the mortgage note from Eskelsen for $65,000 because he felt that the lien on the land securing *322 the note was a poor investment for Putnam Dyes since title to the land had not yet been perfected. Eskelsen then repaid Putnam Dyes the $65,000, thus leaving Nimmo with the mortgage note. Respondent determined that Nimmo received income of $65,000 in 1966 as a result of the loan by Putnam Dyes to Eskelsen for use in the project. On June 30, 1966, Alvin P. Jackson of Goodrich, Dalton, wrote one of Windham's creditors, describing the efforts of the creditors to salvage some value from the project: * * * In a few cases, some arrangements were made to pay between 5% and 10% of certain claims * * *. One preferred creditor, a bank, is going to be paid, and then the balance of the creditors of the corporations will surrender their obligations to a new corporation in return for stock. The new corporation, under circumstances which we feel will foreclose any nonparticipating creditors, will take such title as exists to the lands in question and will continue the prosecution of the actions to clear the titles. The participating creditors will then have to take second place to new investors who it is hoped will come into the scene to advance more money to develop the land and the proposed *323 Club. Only if this rather nebulous development takes place will there be any profits in the new corporation which may, in the next ten or fifteen years, pay off the new investors and leave something to be received by the participating creditors. They are gambling on this eventual possibility, since any other route leaves them with a 100% loss. Those creditors that were paid were able to be paid only because of funds advanced by Nimmo for this purpose. Moreover, it was only because Nimmo invested more funds that it was possible to continue work to clear title to the land and form the new corporation. On August 15, 1966, Nimmo received a letter from his attorneys in which the projected cost of deeding the lands to the new corporations and the costs of certain works to the local government ("Village") were set forth and which also suggested to Nimmo that certain other properties be purchased for the project. In response to this letter, Nimmo stated that the amount to be paid the Village was excessive and that he did not believe any more land should be purchased until a firm arrangement was made with the Village.On February 10, 1967, Baylon wrote Nimmo regarding the progress of negotiations *324 with the Village. Baylon further stated: * * * to prepare the pertinent complaints in your name against the Club de Golf Monte Castillo and Inmobiliaria Monte Castillo companies both with respect to your personal claims and those acquired by you from Messrs. Damy, Hohenemser, etc. Subsequently Inmobiliaria Tepoztlan, S.A., which has assumed the liabilities of the Monte Castillo companies will execute a judicial agreement with you recognizing such debts as its own, to enter same in the new accounting of the company. Thereafter Inmobiliaria Tepoztlan shall agree with you as to the manner of payment of your claims, it being understood that the preference credits acquired by you from Banco del Pais, S.A. and others shall be secured with mortgage on the properties and the remainder of the common claims shall be paid by a new issue of stock of Inmobiliaria Tepoztlan, S.A. de C.V., which will be delivered to you. The letter also revealed that Nimmo, through Monroe Chemical de Mexico, S.A., one of his wholly-owned corporations, sent 60,000 pesos to be used by the new corporation (Inmobiliaria Tepoztlan, S.A.) in furtherance of the project. On June 1, 1967, Nimmo filed suit against Commercial *325 and Club de Golf Monte Castillo in the Fourth Civil Court in Mexico City for $165,000. 13 No judgment was ever recovered. Nimmo filed another civil suit on the same day in the Fourth Civil Court of Mexico against Windham in the amount of $365,800, and again, no judgment was ever recovered. On June 5, 1967, Nimmo sued Club de Golf Monte Castillo and Inmobiliaria in the Fourth Civil Court in Mexico City for repayment of $730,230 and in a separate action filed on the same day, Nimmo sued Club de Golf Monte Castillo and Inmobiliaria for $33,250. No judgments were ever recovered in these actions. On August 16, 1967, Irving Bennett and/or Sylvia Bennett sued Commercial, James B. Windham, and Club de Golf Monte Castillo in the Fourth Civil Court, in Mexico City claiming $46,875 was owed to them by the defendants. On the same day, they filed a second suit against the same defendants for $50,000. As with the previous actions brought by Nimmo, no judgments *326 were ever recovered in these suits. In March 1967, a memorandum relative to the status of the project's creditors was prepared. After appraisals were made by real estate experts of the project's land, it was estimated that in bankruptcy, the creditors could hope to obtain only a small fraction of their investment. Accordingly, it was noted that the only feasible way of realizing any value from the project land was through its sale or by obtaining additional financing to carry on the development of the golf club and real estate subdivision. It was stated that Nimmo and other creditors had been trying to obtain additional financing but it did not seem "at all promising" that they could obtain it. Nonetheless, it concluded that "efforts are being made to carry out said project and creditors nourish the hope that during the next year still to run, the project may be fully achieved so as to obtain the maximum possible recovery of the credits." In 1968 the owner of one of the construction companies originally contracted by Windham to build the project told Nimmo that he was still interested in the project and offered to invest $200,000, provided Nimmo could clear title to the land. *327 Nimmo, did not believe he could clear title and was not therefore interested in the offer. Since 1968, Nimmo has tried to find investors and at one point placed and advertisement in the Wall Street Journal. He received about 20 inquiries in response to the ad but no one took a serious interest in the project. In 1974, an individual in Mexico City named Negrete purchased an interest in the project. The first payment of $184,000 was made but as of 1977 he, too, had been unable to clear title on the land. Because of this, Negrete could not raise additional financing and it does not appear (as of the date of trial) as though Negrete will be able to fulfill the remaining payments due on the contract. Moreover, there is a possibility that Nimmo will have to repay the $184,000. 14In November 1968, Goodrich, Dalton completed its efforts on behalf of Irving Bennett to find assets of the three companies involved in the projects (Commercial, Club de Golf Monte Castillo, and Inmobiliaria Monte Castillo) *328 and of Windham on which attachment could be levied. The firm concluded that Windham had no assets that could be attached and was not making enough salary to make payment on the obligations. Further, it found that the companies were without assets and insolvent and that there was no chance of Bennett's recovering his losses and that as of November 15, 1968, Bennett should conclude that his investments were worthless. In 1969 Nimmo asked a Nashville, Tennessee law firm to investigate his chances of recovering all or some of the advances he had made to the project. In 1970 the firm made its final report to Nimmo and in its' judgment, Nimmo's losses were beyond recoupment and Nimmo had made every reasonable effort to recover the loans. Loss on Purchase and Sale of Georgia MortgagesOn May 10, 1968, Nimmo, Nimmo & Associates (a holding company organized by Nimmo, as hereinafter described) and State Security Life Insurance Company (hereafter State Security) entered into an executory contract whereby Nimmo and Nimmo & Associates agreed to sell to State Security their 65.5 percent interest in Great States for $2,350,000, Closing was to take place on or before August 28, 1968. Part of *329 the sales agreement required Nimmo to personally guarantee the validity and worth of the Georgia farm mortgages held by Great States and guarantee payment of 65.5 percent of the mortgages. Liability was limited, however, to $125,000 as to the principal amount owed plus 65.5 percent of all interest and expenses paid or incurred by Great States in attempting to collect payment. The Georgia farm mortgages were not worth their face value on May 10, 1968, as previously indicated, and Nimmo knew that this was the case. On or prior to July 31, 1968, Flint, Inc., Pulaski Farms, Inc., and Greenlake, Inc., sold the lands which secured the Great States' mortgages. The proceeds from these sales was transmitted to Great States by Kyle and Great States reduced its loans receivable balances by these amounts.The total balance due on these three corporations' loans as of July 31, 1968 was $40,698.14 which Nimmo then paid on that date to Great States. 15 ($2,177.11 of this amount was the balance due from Green Lake, Inc.) Also on July 31, 1968, Nimmo paid by check the amount of $367,295.63, representing the total amount owed Great States by the five remaining Georgia corporations (Leo Farms, Inc., *330 Tazwell, Inc., Marian County Farms, Inc., Land, Inc., and Taylor County Farms, Inc.). Of this amount, Nimmo paid $109,440.59 for the Leo Farms, Inc. mortgage and $52,315.20 for the Taylor mortgage. Nimmo thereby succeeded to the interest held by Great States in the property.On December 20, 1968, the properties of Taylor County Farms, Inc., and Leo Farms, Inc., were sold for $90,000 and the proceeds paid to Nimmo. On Schedule D of his 1968 tax return, Nimmo reported a short-term capital loss of $112,453.93 (as a worthless non-business debt) computed as follows: Amounts paid to Great States on$ 40,698.14Flint, Pulaski, & Greenlake notesAmount paid to Great States for161,755.79Leo and Taylor notesLess: Amount realized from sale(90,000.00)of Taylor and Leo FarmsLoss$112,453.93Respondent disallowed this loss. Legal Expenses in Sale of Great States StockNimmo incurred legal expenses of $63,500 which were paid in 1968 arising out of the *331 sale of his Great States stock to State Security. Nimmo deducted $11,833.99 of this amount relating to a commission contract, and $2000 paid in connection with an employment contract which was incorporated into the sales contract. An additional $500 of this $63,500 was paid to have interest earnings computed. Nimmo deducted this $500 although he was reimbursed by State Security for this sum. The balance not deducted ($49,166.01) included costs to draft documents, settlement negotiations, court appearances, and other expenses associated with the sale. These amounts were not added to Nimmo's basis in the stock nor were they deducted by Nimmo. Nimmo, in his amended petition in this case, asks for a deduction for the full $63,500. On brief, however, he asks only to increase his adjusted basis by $60,000 to reflect the foregoing. Dividends from Teachers Finance and First TeachersFrom time to time, Nimmo borrowed money from both Teachers Finance and First Teachers. These amounts were listed on the companies' ledger. As of September 30, 1968, Nimmo owed Teachers Finance $519,789.29. The ledger shows a credit to the account on October 7, 1968 of $469,289.29. When Nimmo sold his *332 Great States stock, he invested $700,000 (of the $708,000 total) of the proceeds in short-term commercial paper with the Continental Illinois National Bank and Trust Company of Chicago. The account was listed in Nimmo's name only, but $469,289.29 represented funds of Teachers Finance, $79,177.22 represented funds of First Teachers, and $159,533.49 represented Nimmo's personal assets. Interest on these amounts were recorded on the corporation's books as earned and both companies paid income taxes on the interest earned. Respondent determined that Nimmo received dividend income in 1968 of $469,289 and $53,204 from Teachers Finance and First Teachers, respectively. Funds from MonroeMonroe Chemical Company deMexico ("Monroe") was a Mexican corporation, 50 percent of the stock of which was owned by Nimmo. On May 1, 1964, Monroe loaned $15,000 to Teachers Finance and on May 1, 1966, loaned it an additional $35,000. Both loans were supported by 5 percent interest-bearing subordinated promissory notes and were due 60 months from the dates executed. Five percent interest represented a fair rate of return to Monroe. These amounts were listed by Teachers Finance as notes payable in its *333 journal.Interest of $750 in 1965 and 1966 and $2500 in 1967 and 1968 was paid on the notes. The notes were repaid on December 31, 1974. Teachers Finance marked on its ledger that payment was made. Respondent determined that these loans from Monroe to Teachers Finance were income to Nimmo. Respondent also determined that the interest paid by Teachers Finance on the loans was income to Nimmo. Henry Awbrey TransactionOn June 9, 1966, Henry Awbrey borrowed $138,500 from Great States in order to purchase 7,000 shares of Horace Mann stock from Teachers Finance. The loan was evidenced by a promissory note due in five years bearing 6 percent interest to be paid annually on June 10 and was secured by 8,650 shares of Horace Mann stock (since the loan had to be secured by stock worth 120 percent of the amount borrowed). In order to meet the collateral requirements, Nimmo loaned Awbrey an additional 1,650 shares of Horace Mann stock. Nimmo, on the same day, purchased for $69,250 from Awbrey 3,500 shares of the Horace Mann stock which Awbrey had just purchased from Teachers Finance. This amount was evidenced by a promissory note due in five years bearing 6 percent interest to be paid annually *334 on June 9 and secured by the 5,150 shares of stock Nimmo owned (including the 3500 he had just purchased) but which Awbrey had used to secure (in part) his loan with Great States. On July 26, 1967, Nimmo paid Awbrey $4,155 representing 6 percent interest on the note and on March 25, 1968, Nimmo repaid Awbrey the full $69,250 principal, plus $3,287.38 interest. Respondent disallowed interest deductions claimed by Nimmo for the foregoing interest payments. Pearson Wade TransactionOn July 20, 1966, Teachers Finance sold 1,000 shares of Horace Mann stock to Pearson Wade. Nimmo arranged a $20,000 loan from Great States on June 9, 1966 at 6 percent interest in order to enable Wade to purchase the stock. Thereafter, Nimmo purchased 500 shares of Horace Mann stock from Wade for $10,000 and gave him a note bearing 6 percent interest. In 1967, Nimmo paid $600 interest on the note. In 1968 Nimmo paid $474.50 interest on the note and repaid the $10,000 principal in full. Respondent disallowed deductions claimed by Nimmo for the interest paid. Nimmo & Associates LiquidationNimmo & Associates was a holding company organized by Nimmo in 1963 to purchase controlling interests in a bank and *335 insurance companies. Della Kyle, Henry Kyle's mother, subscribed to purchase 12,510 shares of Nimmo & Associates' class A stock and 250,000 shares of its class B stock. During 1965, Kyle contacted Nimmo and asked him to repurchase his mother's shares of stock. By letter dated May 4, 1965, Nimmo directed Kyle to purchase for and on behalf of Nimmo all of Della Kyle's stock for $50,000. Nimmo paid $40,000 down and issued a promissory note for the remainder of the cost. The $40,000 payment was to come from funds Kyle was "holding" for Nimmo; "such special funds being a portion of the $480,000 loan made previously to me [Nimmo]." The $480,000 was, in fact, the amounts Flint, Inc. loaned Windham and payment of which Nimmo had guaranteed.At this time, Kyle gave an accounting to Nimmo in which he erroneously stated that there remained only $38,176.14 of the original $480,000. There was actually $39,176.14 in the account. Kyle, however, gave Nimmo credit for only $38,176.14 against the purchase price leaving a balance due of $11,823.86. Kyle then offered to loan Nimmo $25,000. Nimmo agreed to borrow this amount and executed a promissory note on February 17, 1966 in favor of Kyle. Nimmo *336 received cash of $13,186.14, and the balance was applied against the $11,823.86 balance due in the Della Kyle transaction. The full $25,000 principal and interest of $3,281 was paid on this note in 1967 when Kyle directed Nimmo to pay these funds to Great States in satisfaction of a loan due Great States by Country Club Management (Kyle's company). Respondent did not allow the $50,000 to offset Nimmo's basis in Nimmo & Associates.Nimmo & Associates was later liquidated and Nimmo deducted a loss of $29,802.80. However, respondent adjusted Nimmo's basis in his Nimmo & Associates stock by disallowing the $50,000 adjustment which had been added as a result of the purchase of Della Kyle's stock, and as a result, he determined that Nimmo had a $20,197.20 gain upon liquidation. Samuel Klurman TransactionAt some time prior to November 1963, Howard Perlman, an officer in Life Assurance Company of the West, a subsidiary of Great States, introduced Samuel Klurman to Nimmo. Perlman was interested in Nimmo & Associates or other companies which might be organized to hold shares of stock in Great States, Life Assurance Company of the West, and Horace Mann. Klurman represented to Perlman and *337 Nimmo that he could make a private placement of the stock of a holding company to be formed to own shares in the above-mentioned companies. Thereafter, on November 8, 1963, Klurman, Nimmo, and Perlman entered into a contract whereby Perlman and Nimmo agreed to form a holding company and Klurman agreed to obtain $3,500,000 of equity capital for which he was to receive a commission. Nimmo and Perlman also agreed to advance $25,000 to Klurman against his future commissions. Of this amount, Nimmo was to advance $23,750 and Perlman was to advance the remaining $1,250. Perlman did not do so, however, and Nimmo advanced the entire proceeds. The proposed sale of stock was never completed and Nimmo was unable to recover funds from either Perlman or Klurman. Although these amounts were not deducted by Nimmo on his income tax returns, Nimmo filed an amended petition in this case claiming that he is entitled to a deduction in 1963 under section 165(c)(2) or 165(c)(3).Rule TransactionGeorge E. Rule is Nimmo's nephew.In the fall of 1965, Nimmo called Rule and told him that he wanted to sell some of his Horace Mann stock in order to raise funds. During the conversation, Nimmo told Rule that *338 the stock would probably appreciate in value and that he preferred to sell the stock to Rule rather than to a stranger so that a member of the family could benefit from the anticipated appreciation. Nimmo further offered to arrange the necessary financing to help Rule purchase the stock. Rule had been one of the first employees of Horace Mann's predecessors and had maintained an interest in the company over the years. Rule considered Horace Mann to be a sound investment and agreed to purchase the stock. Nimmo arranged a loan from Great States for Rule in the amount of $200,000 for which the Horace Mann stock was to be pledged as collateral. On October 25, 1965, Rule signed a promissory note payable to Great States in the amount of $200,000, to be used to purchase the stock. Rule executed another promissory note in the amount of $51,100 payable to Nimmo in order to finance the remainder of the purchase price. Nimmo then transferred his 12,555 shares of stock to Rule by directing the company's transfer agent to effectuate the transfer and issue a stock certificate to Rule. The note was renewed the following year, and as collateral for the note Rule assigned his rights to the 12,555 *339 shares of Horace Mann stock he had purchased. On his 1965 Federal income tax return, Nimmo reported capital gain income resulting from the sale of his stock to Rule. On April 29, 1966, the Executive Vice-President of Horace Mann Life Insurance Company wrote to the shareholders of Horace Mann, including Rule. He stated that the company had declared a 10 percent stock dividend which all shareholders would be receiving shortly. He also stated that the company had been advised by counsel that under Federal tax laws no gain or loss would be realized by shareholders on the receipt of the new shares, but that cash proceeds from the sale of fractional shares would be considered ordinary dividend income. Subsequently, Rule was sent a stock certificate from Horace Mann indicating his ownership of an additional 1,255 shares of Horace Mann stock. In addition, he received a check for $9.09 representing the value of the fractional share of stock which, together with the 1,255 shares he received, totaled 10 percent of his Horace Mann stock holdings. The stock was then assigned to Great States which issued a check for $25,000 in payment therefor. In October 1967, Rule received a letter from *340 the President of Horace Mann Life Insurance Company enclosing another stock dividend of 10 percent, or 1,255 shares and a cash dividend of $10.13 for the value of the fractional share of stock which, together with the 1,255 shares he received, totaled 10 percent of the Horace Mann stockholdings. Rule decided to sell this stock dividend, just as he had sold the previous year's dividend, and assigned his right to the 1,255 shares to R.S. Dickson & Company, a brokerage house, and received payment for those shares in return. In both 1966 and 1967, Rule received Forms 1099 from Horace Mann indicating that his income resulting from the stock dividends was represented by the cash proceeds of the fractional shares. Rule received several letters from Horace Mann which Rule believed stated that no Federal tax accrued from the issuance of the stock dividend. Therefore, when he filed his 1966 and 1967 Federal income tax returns, Rule did not indicate that he had income from the sale of the entire stock dividends. Rather, he included only the cash payment for the fractional shares that he received. Rule did pay Florida personal property tax on his ownership of the Horace Mann stock, however, *341 and filed amended Federal income tax returns for the years 1966 and 1967 to include in his income for those years the amounts derived from the sale of the Horace Mann stock dividends. The Internal Revenue Service reviewed Rule's amended Federal income tax returns for both years and recommended that they be accepted as filed. Rule gave Nimmo the cash proceeds from the sales of the stock dividends in payment of debts resulting from joint ventures in which they had participated, but which had failed. However, the amounts Rule sent Nimmo were in excess of the amounts he owed Nimmo and it was not until much later that Nimmo and Rule had an accounting and discovered the overpayment. In 1966 and 1967, interest payments on Rule's loan from Great States became due. Rule did not have sufficient funds and he asked Nimmo to loan him money in order to make the interest payments. Nimmo did, in fact, loan Rule the money Rule had requested. Additionally, when the State of Florida assessed Rule for property tax accruing as a result of his ownership of the 12,555 shares of Horace Mann stock, he did not have the funds available to pay the tax and again had to ask Nimmo to advance him the money *342 to pay. Rule finally decided to sell the stock and in a letter dated June 15, 1968 authorized the sale of half of his stock being held by Great States as security for its loan. Rule relied upon Nimmo's advice as to when to sell the stock. Several brokers handled the sale of Rule's Horace Mann stock, and as the stock was sold, the proceeds were sent to Rule. After selling the stock, Rule paid in full, with interest, his note to Great States (a total payment of $216,000). A substantial portion of the balance of the sale proceeds was used to cancel his debts to Nimmo incurred in various ventures which Rule had entered and in which Nimmo had supported him. Rule relied on Nimmo to determine the accounting between them but Nimmo never pressured Rule to repay him nor, in fact, ever asked Rule for repayment from the sale proceeds or at any other time. This was consistent with previous transactions in which Nimmo and Rule were engaged and in which Nimmo had tried to help Rule. Routinely, neither party would require receipts or rigorous accounting and Rule relied entirely on Nimmo to keep the accounts. Rule reported the sale of his stock on his 1968 Federal income tax return and paid *343 approximately $16,000 in taxes resulting from the sale. Rule asked Nimmo for the funds necessary for the payment of the tax and Nimmo advanced him the money. Respondent determined that Nimmo was beneficial owner of the stock and that gain on the sale by Rule should be attributed to Nimmo. Interest in 1968 on Bonds Purchased by Teachers FinanceRespondent determined that Teachers Finance should have reported $4,000 in interest income in 1968 in connection with a $200,000 note it purchased from Great States. At the time that Teachers Finance purchased the note, the note had accrued interest of $4,000 and was, therefore, purchased for $204,000. Teachers Finance apparently listed the bond as an asset for $200,000 and debited interest income of $4,000 (in lieu of setting up the accrued interest as an asset). Under its normal accounting procedures, as the interest was received, Teachers Finance would credit interest received.Teachers Finance also purchased another bond during 1968 with accrued interest of $702,39. Respondent determined that Teachers Finance should have reported this amount is interest. Gain on Sales of Horace Mann StockIn 1966, Nimmo sold 218 shares of Horace Mann*344 stock in which he claimed a basis of $226.72, realizing a gain of $4,133.28. Nimmo made other sales of Horace Mann stock during 1966 of 180 shares, 200 shares, and 9,443 shares. The adjusted basis in Nimmo's stock for all of these transactions is in dispute. In 1968 Nimmo reported gain of $273,287.40 on the sale of 10,170 shares of Horace Mann stock, computed by subtracting from the amount realized of $312,750 an adjusted basis of $39,462.51. Respondent determined that Nimmo understated his gain by $201.89 on the sale because of an overstatement of basis. Liquidation of Horace Mann InvestorsHorace Mann Investors was a company organized to buy and sell securities, which was liquidated in 1964. Respondent determined that Nimmo realized a gain of $1,000 upon such liquidation. OPINION 1. Bad Debt Losses on Direct Advances including the Mexican ProjectRespondent contends that advances made by petitioners for use in the project were capital contributions to the project corporations. In the alternative, respondent argues that if the advances constituted loans, they constituted loans to the corporations, not Windham. In either case, respondent contends that the corporations were *345 not worthless and petitioners are not entitled to any loss. It is petitioners' position that the advances were loans to Windham personally, and, because Windham was insolvent, the loans were worthless. Respondent apparently concedes, as is obvious from the record, that Windham was insolvent by 1964 and that there was no prospect of recovery against him personally. Therefore, only if petitioners were creditors of (or investors in) the corporations formed to develop the project could it be argued that the advances made to Windham were not worthless. We agree with respondent that worthlessness must be judged upon the project's financial viability rather that on Windham's personal worth. It is clear that the funds advanced by petitioners to Windham, although signed only by Windham and without any corporate designations, were not for Windham's personal use but for use by the corporations in the project. Petitioners correctly state that the fact they knew the advances were to be used by the corporations does not of itself mean that they had any rights against the corporations involved in the project. Nonetheless, we believe that the nature of the transactions is such that petitioners *346 had rights as creditors (and not as investors) against the corporations. Thus, the eventual loss of the amounts advanced would represent bad debt losses. When the project was first commenced, Nimmo purchased 49 percent of Commercial's stock. When Windham told Nimmo that additional capital was needed, Nimmo returned his stock to become a creditor of Commercial. Windham agreed to give Nimmo a promissory note secured by a first mortgage on the project land and by all of Commercial's stock. In July 1961, Windham authorized Nimmo to allocate a number of shares of Commercial's stock among the petitioners as security for the advances each made.The documentation of the loans and letters written by Nimmo, Windham, and the various attorneys in the case generally refer to Nimmo as a creditor (of the corporations) both before and after Windham fled Mexico. Indeed Nimmo caused Putman Dyes to purchase the Banco de Pais note rather than purchase it himself because he considered himself already to be a major creditor of the project. Nimmo also demanded repayment of some of his advances and was partially repaid in 1963 out of the proceeds of the Flint loan. Nimmo continued to try to salvage the *347 project through 1964 and 1965 and beyond in hopes of recovering his advances. After Windham left Mexico, Nimmo effectively took control of the project and not only continued to advance additional money, but also personally paid loans to some of the Mexican corporations' creditors. In fact, on the day Windham departed Mexico, Nimmo and Windham signed an agreement in which Windham was to transfer all of the stock in Commercial and Castillo to Nimmo as security, and the previous advances made by Nimmo to Windham for use in the project were to be considered as investments by Nimmo (for purposes of determining future profit shares). Moreover, Nimmo brought suit against the project. corporations, as well as against Windham, in an attempt to recover some of the advances. It is simply too difficult to believe that Nimmo would loan Windham money on Windham's personal note so that Windham could invest the proceeds in the project 16 without the security of the project corporations. Both Nimmo's actions and testimony at trial indicate that he believed he (and First Teachers and Teachers Finance) were creditors of the Mexican corporations. 17 We note also that Windham always considered Nimmo *348 a creditor of the project corporations. We hold that Nimmo, First Teachers and Teachers Finance were creditors of the project as conducted through the Mexican corporations. We must now determine whether the project was worthless in 1964 *349 18*350 or in any other years in issue. The question of when a debt becomes worthless is a factual one to be determined upon all the surrounding facts and circumstances with the burden of proof resting with petitioner. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Petitioners must show that the debt lacked potential value as well as current liquid value. Worthlessness is determined by objective standards and is usually met by showing that some identifiable event occurred during the course of the year which effectively demonstrates the absence of potential value, although such is not indispensable. Dustin v. Commissioner,supra, at 501. See also James A. Messer Co. v. Commissioner,57 T.C. 848, 861 (1972). Finally, petitioners correctly point out that a taxpayer need not be an "incorrigible optimist" and the debt need not be worthless beyond all doubt since a bare hope that something might be recovered in the future does not constitute a sound reason for postponing the time for taking a deduction. See Boehm v. Commissioner, 326 U.S. 287 (1945), rehearing denied 326 U.S. 811 (1946). Respondent points to Nimmo's efforts during the years in issue to salvage the project and to offers by new investors as evidence of the project's viability. During 1964 and through July 1965, Nimmo and Kyle maintained the project and Kyle advanced $2,700 per month out of the $480,000 *351 Flint loan to keep guards and provide other maintenance functions and to pay legal fees in attempting to obtain title to the land and reach a creditors' agreement. In April 1964 the creditors of the project drafted an agreement to protect it from bankruptcy although the agreement fell through.Other attempts were made to reach an agreement so that additional funds could be obtained in order to complete the project. In April 1965, Nimmo met with the Secretary of the State of Morelos to discuss the project and steps that could be taken to salvage it. Nimmo hired a new law firm in early 1965 to handle negotiations with creditors, dissolution of the companies, and the transfer of the land into a new company. It was noted in a memo of August 18, 1965, that Nimmo had received an offer to purchase the land with imperfect title representing 25 percent of the value of the outstanding credits. It was not until August 1965 that the project's office was closed down. Nimmo's efforts continued after the project's office was closed. He advanced additional funds to pay off certain creditors to continue work to clear title to the land and to form a new corporation. 19*353 We also find it significant *352 that Nimmo caused Putnam Dyes, Inc., to purchase the Banco de Pais note in April 1966 for $65,000 in order to protect his other loans. The Mexican corporations obviously could pay no interest on the note unless additional creditors were brought in to make the project successful. 20 Yet Nimmo apparently believed the loan to be a good investment. It was not until September 1968 that Nimmo purchased the note from Eskelsen because he felt it was a poor investment. In this respect, we note that the taxpayer's attitude and conduct are not to be ignored in determining the worthlessness of a debt. Boehm v. Commissioner, supra, at 291, 292. In 1968, Nimmo turned down an offer from a construction company to invest $200,000 because he did not believe he could clear title to the land. Also in late 1968, Goodrich, Dalton completed its efforts to recover the loans for another of the project's creditors, Irving Bennett, whom it had also been representing, and stated that Bennett's investments were worthless.21 In 1969, Nimmo hired a law firm in Nashville to investigate his chances of recovering all or some of the advances he made to the project and the resulting report, issued in 1970, noted that Nimmo's losses were beyond recoupment. It has been held that an attorney's opinion formed with knowledge of facts concerning the debtor's financial condition is evidence to support deductibility of bad debts. 22*355 *354 Downing v. Commissioner,43 B.T.A. 1147, 1152 (1941); Johnstone v. Commissioner,17 B.T.A. 366, 368 (1929); United States Tool Co. v. Commissioner, 3 B.T.A. 492 (1926). On these facts we believe the advances were worthless by the end of the calendar year 1968. Therefore, Teachers Finance and First Teachers are not entitled to bad debt deductions in their fiscal years ending May 31, 1965, and September 30, 1965, respectively, but they are entitled deductions in their fiscal years which include December 31, 1968. 23 Although Nimmo continued to try to find investors after 1968, and one person invested $184,000 in 1974, we discount the weight to be given these facts. The lack of Nimmo's success in finding any investors since 1968 goes far to mitigate the significance of this one additional investment. Moreover, this investor also failed to clear title to the land, without which the project was worthless. 2. Payments by Nimmo in 1964 and 1967 pursuant to his guaranteeInitially, we note that because we have found that the Mexican corporations were not *356 worthless until 1968, no deduction is allowed Nimmo during 1964 and 1967 for payments on his guarantees to Delta, Land, Inc., and Flint, Inc. since no deduction is allowed for payment of a guarantee until the underlying debt becomes worthless. Respondent's only argument on brief is that no deduction should be allowed because the debts were not worthless. Respondent apparently concedes that if the Mexican corporations were worthless, Nimmo is entitled to a deduction under section 166(d)(1)(B). 24 We view the sequence of transactions between Great States, the Georgia Corporations, and the Mexican Corporations as loans made not by Great States to the Georgia corporations and from the Georgia corporations to the Mexican corporations (guaranteed by Nimmo) but as loans made by Great States indirectly to Nimmo and then from Nimmo to the Mexican corporations. 25 It is clear that the Georgia corporations were *357 dummy corporations set up specifically for this purpose. Nimmo was aware at all times that the loans were to be used for the Mexican project and was aware of the over-appraisals although Windham and Kyle appear to be the initial force behind the loans. Nimmo guaranteed the loans from the Georgia corporations to the Mexican corporations.The corporations were set up at Nimmo's and Kyle's direction to avoid lending restrictions on Illinois insurance companies and the loans from Great States to the seven Georgia corporations were made at 6-1/2 percent, the same rate of interest at which the Georgia corporations loaned the money to Windham for use in the project. Moreover, Nimmo apparently had control over the disposition of the later loans made by Flint, Inc., to the Mexican corporations (since Kyle could not advance the funds without Nimmo's approval) and we see no reason to treat the loans made by Land, Inc., and Flint, Inc., differently. When the Mexican corporations *358 could not make payment to the Georgia Corporations, Nimmo was required to do so pursuant to his guarantees. Thus, to the extent payment on his guarantees represented only repayment by Nimmo of Great States' (indirect) loans to him, he would not be entitled to a short-term capital loss as a guarantor of a worthless debt. Nonetheless, we believe Nimmo is entitled to a bad debt deduction for the amounts paid the Georgia corporations (who then paid Great States). Since we view the loans as loans from Great States to Nimmo and from Nimmo to the Mexican corporations, when the Mexican corporations became worthless in 1968, Nimmo became entitled to deduct his loans to them. 26 3. Fraud Loss - 1965 and 1966Nimmo contends that he would not have guaranteed the loans the Georgia corporations made to the Mexican corporations except for Windham's *359 misrepresentations and he is, therefore, entitled to a theft loss under section 165(c) (3) on payment of the guarantees. As noted in our discussion of the payments made in 1964 and 1967 on the guarantees, Nimmo is not entitled to a deduction in either 1965 or 1966 since the Mexican corporations were not worthless during those years. 27 Rather, he would be entitled to a deduction, if at all, only in 1968. As we stated previously, moreover, we believe these guarantees must be considered as loans from Great States to Nimmo and from Nimmo to the Mexican corporations. Thus, the alleged misrepresentation by Windham must be viewed as causing Nimmo to loan his personal funds to the Mexican corporation. We must first determine what law we must look to to determine whether a theft loss occurred. Respondent contends that Mexican law controls, while Nimmo maintains that it is Illinois law to which we must turn to analyze the transaction. See Paine v. Commissioner,63 T.C. 736 (1975), affd. in an unpublished opinion by the Fifth *360 Circuit. Nimmo argues, moreover, that respondent is estopped from arguing that Mexican law controls because the issue has been untimely raised. 28 We do not reach the issue of whether Mexican law rather than Illinois law, applies because we do not believe Nimmo has established a theft loss even under Illinois law. Although we agree with Nimmo that Windham made false representations so that Nimmo would guarantee the loans in issue, Windham always intended to repay him. The loans were for use in the project in which both Windham and Nimmo had heavily invested. Windham (and Nimmo) knew the project was in need of funds and Windham, although aware of the project's desperate situation (whereas Nimmo believed these funds would make the project a success), used the funds in hopes of salvaging the project. It seems clear from the record the Windham believed or at least hoped that the project could become successful and that Nimmo would be repaid (or that Windham would pay the notes as the project became successful so that Nimmo would not have to do so). The fact that Nimmo's assessment of the project might have caused him to not make the guarantees had he known its actual condition does *361 not mean that Windham was guilty of theft under Illinois law. Under Illinois law, the essential elements which must be proved for a conviction of theft by deception are, among other things, that the person intends to deprive the owner permanently of the use or benefit of the property. People v. Decker,19 Ill. App. 3d 86, 311 N.E. 2d 228 (1974). If the borrower of funds had the intent to pay back the original loan, failure to repay would establish a breach of contract but not a theft. Howard v. United States,497 F.2d 1270 (7th Cir. 1974). 29*363 *364 Since Windham always intended to repay the loans, there was no theft. Cr. Skolnik v. Commissioner, 55 T.C. 1055 (1971). *362 We have no doubt, however, that if Windham had not intended to repay the loans it would have constituted theft under Illinois law and be deductible under section 165(c) (3) (assuming that Illinois law is applicable). See Lucas v. People, 75 Ill. App. 662 (1898); Rev. Rul. 71-381, 1971-2 C.B. 126. 4. Loss in 1968 on Purchase of Georgia MortgagesOn July 31, 1968, Nimmo paid $40,698.14 representing the principal balances and accrued interest due Great States on the loans made to Flint, Inc., Pulaski Farms, Inc., and Greenlake, Inc. and $367,295.63 due Great States on the loans to Marion County Farms, Inc., Taylor County Farms, Inc., Tazwell, Inc., Lea Farms, Inc., and Land, Inc., (the Georgia farm corporations). Nimmo thereby succeeded to the interest held by Great States in the property. These transactions were consummated as part of the purchase by State Security of Nimmo's and Nimmo & Associates' 65.5 percent stock interest in Great States whereby, as part of the inducement for the purchase, Nimmo agreed to guarantee the validity and worth of the remaining Georgia Farm mortgages up to $125,000, plus 65.5 percent of any uncollected interest and legal fees incurred to collect the mortgage. 30 (On or prior to July 31, property held by Flint, Inc., Pulaski Farms, Inc., and Greenlake, Inc., had been sold and the proceeds applied to balances due on the loans to these corporations.) On December 20, 1968, the properties of Taylor County *365 Farms, Inc. and Leo Farms, Inc. were sold for $90,000, and the proceeds paid to Nimmo. 31Nimmo reported the transactions as giving rise to short-term capital losses on his 1968 tax returns, reflecting the cost to him for the purchase of the Flint, Pulaski, Greenlake, Taylor, and Lee mortgages as his cost basis and the proceeds of the December 1968 sale as the gross sales price.Respondent has not set forth any argument or reasons for disallowing the loss claimed and relies solely upon the presumption of correctness of the notice *366 of deficiency. Nonetheless, we do not believe Nimmo has established that he is entitled to a bad debt loss. When Nimmo guaranteed the Georgia mortgages (i.e. the loans from Great States to the Georgia corporations) it is clear that he did so in order to consummate the sale with State Security. Thus, when Nimmo discharged the liabilities he was simply performing his part of the sales agreement. When he purchased the notes, Nimmo knew that they were either wholly worthless (in the case of Flint, Inc., Pulaski Farms, Inc., and Greenlake, Inc. since these corporations had previously sold the land securing the mortgages and had no other assets) or were partially worthless (to the extent the other Georgia corporations had not yet sold the land). In this respect, payment by Nimmo did not create a bona fide debt between him and the Georgia corporations (or anyone else) which he could charge off as worthless. Eckert v. Burnet,283 U.S. 140 (1931); Wilson v. Commissioner, 40 T.C. 543, 550-551 (1963). We believe, however, that Nimmo's payments (which he deducted) should be considered as capital contributions to Great States, 32 and added to his basis since they were made to render his stock *367 saleable. Cr. Menihan v. Commissioner,79 F.2d 304 (2d Cir. 1935). 335. Legal Expenses in Sale of Great States StockNimmo paid legal expenses of $63,500, arising out of the sale of his Great States stock to State Security. Of this $63,500 Nimmo deducted $11,833.99 relating to a commission contract, $500 paid to get interest earnings computed and $2,000 paid in connection with an employment contract incorporated into the sales contract. He was reimbursed for $500 of his costs but neither deducted nor added to his basis the remaining $49,166.01. 34*368 This amount included costs to draft documents, for settlement negotiations, court appearances, and other expenses associated with the sale. We have found as a fact that payment was made. Since legal fees incurred in the sale of property are generally allowed as an increase to basis, Ward v. Commissioner,20 T.C. 332 (1953), affd. 224 F.2d 547 (9th Cir. 1955), Nimmo has made a prima facie case for allowing the off-set, and in the absence of any argument by respondent to the contrary, 35 we hold Nimmo is entitled to an increase in basis of $49,166.01 36 and a corresponding decrease in capital gains on the sale. 6.Dividends from Teachers Finance and First TeachersRespondent *369 determined that Nimmo received dividends in 1968 of $469,289.29 from Teachers Finance and $53,204.32 from First Teachers. We are left without the benefit of respondent's reasons for his determining that Nimmo received dividends. As to the alleged dividends received from Teachers Finance, we assume respondent charged Nimmo with a dividend because Teachers Finance credited Nimmo's debt to it to that extent. Clearly, where a corporation cancels a shareholder's debt without repayment, the shareholder has received a dividend (to the extent of earnings and profits). We infer from this that respondent does not believe that Teachers Finance actually owned its share of the commercial paper ($469,289.29), which Nimmo purchased with the proceeds from sale of his Great States stock, although such amounts were considered by Nimmo to be owned by Teachers Finance. Nimmo maintained separate accounts for those amounts representing funds owned by his corporations and we held in our findings of fact that Teachers Finance was paid, in full, the $469,289.29. Respondent did not cross-examine Nimmo as to this point nor does he make any arguments on brief. We hold for Nimmo on this issue.We cannot surmise *370 why, in the absence of any argument, respondent attributed $53,204.32 as a dividend to Nimmo from First Teachers since there is nothing in the record to suggest it credited Nimmo with a repayment of a loan for this amount or that Nimmo otherwise constructively received this amount. Accordingly, we hold for Nimmo on this issue. 7. Funds from Monroe de MexicoNimmo has introduced sufficient evidence to overcome respondent's determination that he realized income on the loans from Monroe to Teachers Finance. It appears from the record that the loans were bona fide and there is no evidence that they were used for Nimmo's personal benefit. Since respondent has not set forth any arguments challenging the bona fides of this transaction, cross-examined Nimmo's testimony or introduced into evidence anything else to rebut Nimmo's position, we hold for Nimmo on this issue. Because the loans were bona fide, there is also no basis for attributing income to Nimmo upon payment by Teachers Finance of the interest due on these notes. 8. Interest Accrued by Teachers Finance Payable to Monroe de Mexico Respondent disallowed deductions for interest accrued as payable to Monroe de Mexico of $4,000 *371 in Teachers Finance's 1967 fiscal year and $25,000 in its 1968 fiscal year. We are, quite frankly, at a loss as to what exactly these amounts represent. The $2,500 interest in 1968 is 5 percent of $50,000, the amount the amount Teachers Finance borrowed from Monroe de Mexico. As we discussed previously, respondent apparently determined that this loan was a sham and was in substance a loan from Monroe de Mexico to Nimmo. It so, Teachers Finance arguably could not accrue interest on the loan and any interest it paid would be a dividend to Nimmo. We held previously that the loan was bona fide. Accordingly, Teachers Finance would be entitled to a deduction for this interest accrued. The $4,000 accrued in 1967 presents a more difficult problem. Petitioner has not briefed this issue 37 and at trial the only question posed in regard to this was as follows: Q. In addition, there is disallowed interest accrued as payable to Monroe de Mexico. This was disallowed in the amount of $4,000.00 *372 in 1967 and $2,500 in 1968. The $4,000 would represent 6 percent of the $50,000, of total outstanding bonds. Did you accrue, on the books and records of the company, any interest in connection with its borrowing from-- A. Yes, I accrued the interest on those notes, same as I accrued them on all the 5 percent notes. We cannot determine on this record how Teachers Finance accrued $4,000 of interest in 1967. We hold that it is entitled to a deduction of $2,500 in both its 1967 and 1968 fiscal years. 9. Henry Awbrey TransactionIn form Nimmo clearly incurred and paid interest on a note (representing a bona fide indebtedness) which he executed in favor of Henry Awbrey when he purchased stock from Awbrey. Respondent nowhere challenges the bona fides of the transaction and states on brief only that petitioner has failed to meet his burden of proof. Although we are without the benefit of respondent's reason for disallowance of the interest deductions arising out of this transaction, it appears that respondent views the transaction as one in which Awbrey was a "dummy" to enable Nimmo to borrow funds from Great States38 so that Nimmo could purchase stock from Teachers Finance. We *373 agree. The purchase of stock by Nimmo from Awbrey was on the same day and for the same price that Awbrey purchased the stock from Teachers Finance. Nimmo provided Awbrey with the additional collateral Awbrey needed to obtain the loan from Great States. After Nimmo purchased the 3,500 shares from Awbrey shares from Awbrey by executing a note in Awbrey's favor, Awbrey retained the stock and continued to use it as collateral for his loan from Great States. The loans from Great States to Awbrey and from Awbrey to Nimmo had the same terms except that Awbrey's interest payments were due one day later than were Nimmo's. The transparency of the transaction is obvious since Nimmo was prevented (or believed he was prevented) from borrowing funds from Great States, he did so through Awbrey. This does not mean, however, that the interest paid is necessarily nondeductible. *374 It is clear that Nimmo attempted to create a bona fide debt (although in possible violation of Illinois insurance law). There was an intent to repay and repayment was in fact made; there was a written instrument evidencing the debt; the note had a fixed maturity date and bore a fixed rate of interest; and the note was secured by collateral worth more than the amount of the loan. Therefore, despite the fact that Nimmo May have violated the law by causing this loan to be made, we believe Nimmo attempted to establish a bona fide creditor-debtor relationship. Since respondent presented no facts at trial to the contrary nor presents on brief any legal theory upon which to disallow the interest deductions, we hold that such amounts are deductible by Nimmo. 39*375 *376 10. Pearson Wade TransactionWe believe this transaction is in all pertinent facts similar to the Awbrey transaction, and the same principles apply. Accordingly, Nimmo is entitled to the interest deductions relating thereto. 11. Nimmo & Associates Liquidation. Respondent has disallowed as part of Nimmo's basis in Nimmo & Associates the $50,000 Nimmo paid Kyle's mother when he purchased the shares of Nimmo & Associates stock she had previously held. By so doing, respondent has denied Nimmo a loss on the liquidation of Nimmo & Associates in the claimed amount of $29,802.80 and instead has determined a gain on the transaction in the amount of $20,197.20. Payment of the $50,000 was to be made by Kyle crediting $40,000 of the $480,000 which Flint, Inc., had loaned Windham and which Nimmo had guaranteed. The remaining $10,000 was to be paid in the form of a promissory note. Consistent with much of respondent's brief, he has not made any argument in relation to this point. Nimmo simply contends that the $40,000 (or $38,176.14) was credited to a debt owed him by Kyle. But the $480,000 was not a *377 loan by Nimmo to Kyle, even in form. The form of the transaction was that Great States loaned Flint, Inc. $620,000, in turn, Flint, Inc. Loaned from time to time the Mexican corporations $480,000, and these loans were guaranteed by Nimmo. At the time this "debt" was credited by Nimmo for Kyle to pay, in part, for the stock there remained $38,176.14 in the account (as shown on the account records). As we noted previously, however, the substance of the transaction was a loan from Great States to Nimmo; Flint, Inc. was merely a dummy set up to avoid Illinois insurance regulations. In this regard, we note that Nimmo wrote Kyle that payment was to come from funds Kyle was "holding" for Nimmo from the "$480,000 loan made previously to [Nimmo]." Thus, even Nimmo apparently considered the loan from Flint, Inc., to the Mexican corporations to be instead a loan to him. Nonetheless, by Nimmo's permitting Kyle to retain the $38,176.14 believed to be in the account, Nimmo thereby became obligated to repay this additional amount to Great States. Payment of the full $480,000 was, in fact, made. Therefore, we hold that Nimmo paid this amount for the stock and it should be included in his basis. *378 Unknown to Nimmo and Kyle at this time, there was actually $39,176.14 in the account. Since Nimmo was credited for only $38,176.14, he paid an additional $1,000 for the stock and asks to increase his basis by this amount. Respondent makes no arguments that the $1,000 should not be included in Nimmo's basis, apparently relying on his general denial of the $50,000 basis increase (due to reasons set forth above). For this reason, having held that Nimmo is entitled to increase his basis based upon the note guarantee, we also increase his basis due to the accounting error. We must now deal with the remaining $10,823.86 paid by Nimmo for the stock by executing a promissory note. The note was paid when Nimmo advanced the funds to Great States to pay interest and principal on a loan which Kyle's company owed Great States. There is nothing in the record that suggests the loan from Great States to Kyle was not bona fide or that the note from Nimmo to Kyle was not bona fide. Respondent again has not set forth his position on this issue. We hold for Nimmo on the basis of the record before us. 12. Interest on Kyle NoteSince we have found that the promissory note from Nimmo to Kyle, used *379 to pay for the stock, was bona fide, Nimmo is entitled to deduct the interest paid on the note. 13. Samuel Klurman TransactionNimmo advanced $25,000 to Samuel Klurman against Klurman's future commissions pursuant to a contract whereby Klurman was to kake a private placement of stock in a holding company which Nimmo and Perlman were to form. The proposed sale of stock was never completed and Nimmo was unable to recover the $25,000 ($1,250 of which represented payments Perlman was required to advance but never did). Nimmo first contends that he is entitled to a theft loss under section 165(c) (3). He maintains that Klurman falsely represented his ability to raise equity capital and that this constituted a theft loss under Illinois law. We reject this argument. There is nothing in the record that suggests that Klurman was anything more than unable to perform his part of the contract. This is not a crime under Illinois law; his representations that he could make a placement which he was later unable to do does not suggest that he had either and intent to mis-appropriate the funds or a belief that he could not sell the stock. Ill. Ann. Stat. ch. 38, secs. 16-1, 17-1 (Smith-Hurd). *380 Nimmo contends in the alternative that since the transaction was entered into for profit, he is entitled to a deduction under section 165(c) (2). We believe that Nimmo has introduced sufficient evidence to make a prima Facie case in his favor. Respondent makes no argument to the contrary nor does he contend that these expenses should be non-deductible because they were incurred in the course of a general search or preliminary investigation of a new investment. See Dean v. Commissioner, 56 T.C. 895 (1971).Respondent completely ignored this issue on brief, setting forth no arguments for disallowing the loss, and resting only on the presumption in the notice of deficiency. Again we believe that Nimmo had adequately overcome that presumption, and we hold for Nimmo. 4014. Rule TransactionIn 1965, Nimmo sold 12,555 shares of Horace Mann Life Insurance Company to his nephew, George Rule. 41 Respondent contends that the sale was a "sham" in order *381 to provide Nimmo with needed cash while at the same time keeping control of the stock and realizing the subsequent stock dividends received by Rule and the proceeds of the later sale by Rule of the stock without incurring any additional tax. In form, the transaction here resembled a sale. Nimmo directed Horace Mann's transfer agent to effectuate the transfer and issue a stock certificate to Rule. Legal title was vested in Rule and he received the benefits (stock dividends and proceeds of the sale of stock in 1968) from ownership of the stock and its burdens (payment of Florida property tax on the stock and Federal income tax *382 on the sale of the stock dividends). We must determine, however, whether the transaction was without economic substance or bona fide business purpose. It has long been held that the transfer of formal legal title is not sufficient to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. Frank Lyon Co. v. United States, 435 U.S. 561(1978).In Higgins v. Smith, 308 U.S. 473 (1940), the taxpayer had sold securities to his wholly-owned corporation at a loss. Because of the control the taxpayer exercised over the operations of the corporation, the court concluded that "there is not enough of substance in such a sale finally to determine a loss." Although Higgins dealt with a sale at a loss and we have a transfer resulting in a gain, we believe that there is no difference in principle between sales at gains and sales at losses. Decon Corp. v. Commissioner, 65 T.C. 829, 839 (1976). Accordingly, a transaction which does not vary control or change the flow of economic benefits is without substance. 42*383 There is no dispute that the sale by Nimmo to Rule was based primarily on Nimmo's need to raise cash rather than on any tax considerations. 43 Indeed, it is respondent's position that Nimmo sold the stock to Rule so that he could arrange for Great States to lend money to Rule, using the stock as collateral which funds would then be transferred back to Nimmo as part of the sale's price, thus avoiding the prohibition in the Illinois Insurance Code prohibiting loans directly or indirectly to any company officer or director. Respondent contends that Nimmo received the benefits of ownership, namely stock dividends and net proceeds from the sale by Rule (which were not reported by Nimmo as income), while at the same time bearing the burden of ownership, having made loans to Rule both for payment of Florida property tax on the stock and for Federal income taxes due on the sale by Rule. Finally, respondent maintains that Rule sold the stock at Nimmo's convenience when Nimmo needed additional *384 funds. Payment to Nimmo of the sales proceeds was for previous loans Nimmo had made to Rule. 44 Nimmo, moreover, never pressured Rule to repay him nor, in fact, ever asked Rule for repayment from the sales proceeds or at any other time. It was Rule who decided when to sell the stock, not Nimmo, although Rule usually relied on Nimmo's advice. Finally, although some suspicion may be cast upon the sale by Nimmo's payment through loans to Rule of Florida Property taxes and income taxes accrued as a result of Rule's sale, viewing the entire transaction in light of the nature of Nimmo's previous financial dealings with his nephew we cannot say that such advances were unusual. Although a close question, we do not find a sufficient degree of control by Nimmo over the stock after he sold it to Rule to disregard the form of the transaction, and we hold for Nimmo on this issue. 15. Interest Income of Teachers FinanceRespondent determined that Teachers Finance earned interest income of $38,010 in each of its fiscal years ending May 31, 1965, May 31, *385 1966, and May 31, 1967 and of $42,712 in its fiscal year ending May 31, 1968. The amount for the first three years represents 7 percent of $543,000, the cumulative amount Teachers Finance loaned to Windham (or the Mexican corporations) for use in the project (although Windham did repay $12,321.34 of this amount in 1963). The $42,712 for 1968 includes $4,702.39 of interest income on certain bonds which Teachers Finance purchased in 1968 (discussed later). Respondent's theory, as best we can ascertain by looking at the notice of deficiency, is that Teachers Finance should be charged with imputed interest from Nimmo since the loans from these corporations, ostensibly to Windham or the Mexican corporations, were in actuality for the benefit of Nimmo and should, therefore, be considered as loans to Nimmo. It is clear that Nimmo caused his corporations to loan money for use in the project and at times the loans which First Teachers and Teachers Finance made were lumped together with Nimmo's personal loans to the project corporations as part of Nimmo's credit balance. But it is equally clear that at all times Nimmo kept separate the accounts, and that the corporations' books reflected *386 that the loans were to the Mexican corporations (thorough Windham). Book entries, of course, cannot be used to conceal the true situation, Kaplan v. Commissioner, 43 T.C. 580, 595 (1965), but Nimmo did not guarantee these loans and the corporations could not look to Nimmo for repayment. We believe on this record that the loans made both by First Teachers and Teachers Finance were bona fide loans to the Mexican corporations, and were not loans to Nimmo. Respondent makes no argument that interest should be imputed when the loans are deemed to run in this matter. 45 Accordingly, we find for petitioners on this issue. 16. Interest on Bonds Purchased by Teachers Finance in 1968Respondent determined that Teachers Finance understated its interest *387 income by $4,000 due to its accounting treatment of a note it purchased for $240,000. Of this amount $4,000 represented accrued interest due on the note prior to its purchase. Teachers Finance listed the bond as an asset for $200,000 (representing the principal). Its treatment of the remaining $4,000 was to debit its interest income account by $4,000. Without passing on the propriety of Teachers Finance's accounting system, we do not believe it leads to an understatement of interest income. Under the method used, although Teachers Finance would debit (or reduce) interest income by the $4,000 paid upon acquisition of the note, it would also credit (or increase) the interest account as the previously accrued payments were received, leading to a wash. This leads to the proper tax result here. When Teachers Finance purchased the note for $204,000 it did not realize interest income of $4,000. The interest had been earned prior to purchase and, therefore, is not taxable to the purchaser. Fisher v. Commissioner, 19 T.C. 384 (1952), affd. 209 F.2d 513 (6th Cir. 1954), cert. den. 347 U.S. 1014 (1954). The same analysis applies to the other $702.39 of accrued interest in 1968. Accordingly, *388 we hold for petitioner on this issue. 17. Basis for Horace Mann StockRespondent determined that Nimmo overstated his basis on his Horace Mann stock. Although Nimmo testified that he correctly computed this amount from his records, he has failed to introduce into evidence those records (which he apparently still has) regarding his basis in the stock. We must find for respondent on this issue as Nimmo has not met his burden of proof. 46*389 Cf. Roberts v. Commissioner, 62 T.C. 834, 839 (1974); Courtney v. Commissioner, 28 T.C. 658, 665 (1957); Halle v. Commissioner, 7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949). *390 18.Dividend from Greenlake, Inc. In the statutory notice of deficiency mailed to Nimmo, respondent determined that the Nimmos received a dividend from Greenlake, Inc. in 1968 in the amount of $112,139.94.The only relationship that Nimmo had with Greenlake that appears from the record was that Great States loaned Greenlake $240,000 secured by a mortgage on property Greenlake owned (as one of the seven Georgia corporations). Greenlake then loaned, through Land, Inc., some or all of this amount to the Mexican corporations. On July 31, 1968, Greenlake sold its property for $122,050.36. Great States received the proceeds from the sale and used them to reduce its note. After the sale, there remained unpaid $2,177.11 on the note which Nimmo then purchased from Great States. We have no idea how respondent arrived at the precise amount of dividend he determined Nimmo received since he did not bother to brief this issue. Because the dividend was allegedly received by Nimmo in 1968 we assume, however, that respondent attributed the sale by Greenlake for $122,050.36 and the subsequent repayment to Great States as a constructive dividend to Nimmo. As stated previously, we view the Georgia*391 mortgage transactions as loans from Great States to Nimmo. We cannot determine why respondent treated the Greenlake transaction differently than the contemporaneous Flint, Inc., or Pulaski Farms, Inc. transactions. In any event, we view the Greenlake mortgage as simply securing, in part, Nimmo's loan from Great States. Nimmo used the proceeds of the sale to repay part of the Great States loan on July 31, 1968, and satisfied the remainder due on the note with his personal funds. In the absence of any arguments by respondent to the contrary, we find for petitioner on this issue. $19. Additional Salary From Horace MannRespondent determined that Nimmo received a salary of $46,000 in 1964 from Horace Mann rather than $45,000 as reported on his return. It is respondent's position that Nimmo's testimony alone does not satisfy petitioner's burden. We disagree. A taxpayer's uncorroborated testimony may be sufficient to carry his burden of proof in cases in which respondent has determined that a taxpayer has unreported income and where respondent has not introduced any evidence to support the deficiency. Demkowicz v. Commissioner, 551 F.2d 929 (3rd Cir. 1977) and cases cited therein. *392 Petitioner was, in general, a credible witness and testified specifically as to the amounts in issue. Respondent has not set forth any facts or theory of law upon which his determination is based. We hold for petitioner on this issue. See also Mysse v. Commissioner, 57 T.C. 680, 694 (1972). 20. Travel and Entertainment ExpensesDuring each of the years 1964, 1965, 1967, and 1968, Nimmo deducted $120 as expenses incurred for entertaining customers. He did not keep records of these expenses, but merely estimated what he believed was only a small fraction of the actual expenses incurred. These expenses must meet the substantiation requirements of section 274(d). Petitioner contends that his credibility is sufficient to corroborate his testimony and that such amounts are, therefore, deductible. It is clear, however, that no deduction is to be allowed under section 274(d) solely on the basis of unsupported testimony, Sanford v. Commissioner,412 F.2d 201 (2d Cir. 1969), cert. den. 396 U.S. 841 (1969), affg. 50 T.C. 823 (1968). Nimmo has failed to meet either the adequate records requirement of section 1.274-5(c) (2), Income Tax Regs. or the requirements of section 1.274-5(c) (3), Income Tax Regs.*393 See also Buddy Schoellkopf products, Inc. v. Commissioner, 65 T.C. 640, 643 (1975). We hold for respondent on this issue. 21. Liquidation of Horace Mann InvestorsRespondent determined that Nimmo received a profit of $1,000 on the liquidation in 1964 of Horace Mann Investors. Nimmo testified at trial that he determined he had no gain based on his records. He has not introduced those records into the record here. Therefore, as we previously held in determining his basis in his Horace Mann stock, Nimmo has failed to meet his burden of proof. 22. Unreported Insurance Agency IncomeRespondent determined that petitioner received additional insurance agency income of $5.20 in 1965 and $111.68 in 1966. We must hold for respondent since no evidence was adduced at trial on this issue by petitioner.23. Interest Paid to Teachers FinanceRespondent disallowed a deduction for interest of $18,833.38 which Nimmo claims to have paid to Teachers Finance in 1968, apparently on the grounds that Nimmo did hot actually pay this amount. Respondent has conceded that Nimmo paid Teachers Finance $57,000 in interest in 1968 for which Nimmo has the cancelled checks. Teachers Finance's ledger shows *394 a credit of $18,333.76 as interest income on December 31, 1968. Nimmo did not testify when he made payment and did not introduce into evidence the cancelled check. Since Teachers Finance was an accrual taxpayer, the fact that it reported the $18,333.76 as income earned on December 31, 1968 is not sufficient, standing alone, to show that Nimmo made payment on or before that date. 47 We hold for respondent on this issue. 24. Horace Mann Retirement Fund and Annuity IncomeThe next issue was must face is whether Nimmo overstated his interest deduction by $82 in 1966 with respect to transactions involving the Horace Mann Retirement Fund or whether he earned interest on an annuity of $250 in 1966. 48*395 We must hold for respondent on this issue. Since these two matters were not discussed at trial or on brief, petitioner has not met his burden of proof. 25. Interest Income of $500 from State SecurityUnfortunately, the record is unclear as to this matter, and neither party addressed this issue on brief. 49 At trial, however, it appeared that Nimmo was under the belief that this amount represented the reimbursement which he had received from State Security upon the sale of his Great States stock in reimbursement for his expenditure in having interest earnings computed. Since Nimmo deducted the original $500 expenditure in his return, it would appear that he agrees that his income should be increased by the $500 reimbursement. Analyzing the notice of deficiency, we cannot determine whether this $500 actually represents the reimbursement from State Security. The only entry in the notice of deficiency in this regard is "Interest received from State Security Life Insurance Co. $13,926.27 less $13,426.27 reported" and therefore there is a $500 adjustment. No deduction was disallowed. *396 On the basis of this record, we must hold for respondent. 26. Interest Accrued by Teachers Finance Payable to NimmoTeachers Finance accrued interest of $8,632.06, $10,112.10, $10,633.45 and $8,547.09 in its fiscal years ending May 31, 1965, 1966, 1967, and 1968, respectively, as paid or payable to Nimmo. Respondent disallowed deductions for these amounts. The record on this issue is very confusing. Although it is clear that Nimmo borrowed funds from Teachers Finance during the years in issue, 50*397 we found nothing in the record which shows that Teachers Finance paid interest on any funds it may have borrowed from Nimmo. At trial, the testimony is regard to this issue centered only on the interest which Nimmo accrued as owing to Teachers Finance on the funds he had borrowed from it. Since the issue here is whether Teachers Finance overstated its interest expense we fail to see the relevance of interest accrued (and earned) on funds it lcaned. We must hold for respondent on this issue. 27. First Teachers Unreported Interest Income in 1965The notice of deficiency states that this adjustment "represents an amount of $1,500 deposited in the corporate bank account and identified as interest income which was not reported on the return." This issue was neither discussed at trial or on brief by either party. We therefore hold for respondent on this issue. 28. Putnam Dyes, Inc.Respondent determined that Nimmo received income of $65,000 from Putnam Dyes. Respondent once again has failed to provide this Court with any theory of law upon which his determination is based. Inferentially, we assume respondent contends that Nimmo received a constructive dividend from Putnam Dyes when he caused it to loan money to Eskelsen so that Eskelsen could purchase the Banco de Pais note. Although this sequence of transactions may be viewed as indirect advances by Putnam Dyes to Nimmo for Nimmo's personal use in the project, the question still remains as to whether such advances constitute dividends. We are convinced by the record that Nimmo at all times intended to personally repay (through Eskelsen) the advances made by Putnam Dyes if the Mexican project failed and that *398 Putnam Dyes was to both enforce the obligation and receive the interest earned by the note. Nimmo did, in fact, make repayment. Although mindful that Nimmo was the dominant shareholder of Putnam Dyes and may have caused Putnam Dyes to purchase the note for his personal benefit, the deciding factor is whether there existed an intent at the time of withdrawal by the shareholder to repay the loan and by the corporation to enforce the obligation. Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). Respondent has not either at trial on cross-examination or on brief attempted to allege a lack of intent to repay nor to assert any other theory of law upon which his determination rests. We therefore hold for Nimmo on this issue. 29. Interest Paid by Nimmo to First TeachersIn 1967, Nimmo paid First Teachers $1,400. This amount was marked on First Teachers' ledger as interest income. Respondent disallowed this as a deduction to Nimmo. We believe that Nimmo's testimony sufficiently corroborates the ledger and, in the absence of any arguments by respondent, the $1,400 consituted interest paid by Nimmo which was properly deductible. 30. Negligence Penalty*399 We do not believe that any of the petitioners were negligent in preparing their returns. The large number of complex transactions were generally treated properly for tax purposes, given Nimmo's determination that the obligations in connection with the Mexican project became worthless in 1964, even though some of the transactions may have been devoid of substance for other purposes (primarily Illinois insurance law). The major factual issue of worthlessness was a difficult question of fact and the other less significant issues on which the various petitioners have not met their burden of proof, does not, on this record, rise to the level of negligence. Decisions will be enteredunder Rule 155.Footnotes1. Cases of the following petitioners are consolidated herewith: Teachers Finance Company, docket No. 2486-76; Leslie W. Nimmo & Betty P. Nimmo, docket No. 2487-76.↩2. All statutory references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue. ↩3. These cases were consolidated for trial, briefing, and opinion.↩4. Hereafter, references to Nimmo are to Leslie W. Nimmo.↩5. All references to Nimmo as a "creditor" in the Stipulation of Facts were subject to the caveat that the terminology was used "to describe form only" and odes not necessarily reflect the substance of the transaction. Accordingly, references in our findings of fact to Nimmo as a creditor do not reflect a finding that Nimmo's interest in the project was that of a creditor rather than that of an equity holder in the Mexican corporations. Moreover, where it is stated that "loans" were made to Windham, those statements do not imply that such "loans" were made to Windham in his personal capacity and does not foreclose an ultimate finding that such "loans" were to the Mexican corporations.6. The parties have stipulated that the loans were made in June. It appears that they may have been made in July. ↩7. GREAT STATES LIFE INSURANCE COMPANY LOANS TO GEORGIA LAND CORPORATIONS↩Transferee/PayeeAmountR. C. Brooks, Escrowee &$120,000Greenlake, Inc.R. C. Brooks, Escrowee &$ 86,800Pulaski Farms, Inc.R. C. Brooks, Escrowee &$120,000Greenlake, Inc.R. C. Brooks, Escrowee &$ 58,000Pulaski Farms, Inc.R. C. Brooks, Escrowee &$120,000Marion County Farms, Inc.R. C. Brooks, Escrowee &$120,000Taylor County Farms, Inc.R. C. Brooks, Escrowee &$120,000TazwellR. C. Brooks, Escrowee &$ 91,000Leo Farms, Inc.R. C. Brooks, Escrowee &$ 98,000Land, Inc.TOTAL$933,8008. With respect to this loan, Nimmo wrote Kyle on October 14, 1963 as follows: This will confirm my agreement to guarantee a loan to be made by you or a corporation controlled by you to Club de Golf Monte Castillo, S. A. and/or Inmobiliaria Monte Castillo, S. A. (both being Mexican corporations) in the aggregate sum of $480,000.00 U. S. Cy. to be repaid in annual installments of $115,200 on October 15 of each year beginning October 15, 1964. The funds are to be advanced to the above mentioned Mexican corporations or their successors from time to time as agreed upon between us.9. The $1,088,000 plus and additional future advances loaned to Windham for use in the project were to be considered investments by Nimmo for this purpose.↩10. Banco de Pais was apparently the only preferred creditor of the project.↩*. The parties stipulated this total. However, the figures add up to $62,302.41.↩11. Nimmo maintained, however, in his amended petition that he should be entitled to a deduction for this additional amount.↩12. Nimmo deducted the amounts paid in 1964 and 1967 as payments on a guarantee rather than as a fraud loss because he felt it would be easier to prove in the event of an audit by the Government. He still believed, however, that he had been defrauded by Windham.13. Previously, on July 11, 1966, Nimmo filed a civil lawsuit against the Club de Golf Monte Castillo and Inmobiliaria in the Fourth Civil Court of Mexico City in the amount of 48,700 pesos. No judgment was ever recovered in that action.↩14. Nimmo reported $112,240 of the $184,000 on his 1974 personal income tax return as a bad debt recovery and the remaining $62,560 as a bad debt recovery on Teachers Finance's 1974 tax return.↩15. After these corporations sold the properties which had secured the mortgages they had no other assets which they could use to pay off their remaining obligations on the notes (since they had been formed only as holding companies to obtain the mortgages).↩16. It appears from the record that even if the loans were considered to have been made to Windham personally, Nimmo had secured the loans with the project corporations' stock. To the extent this is so, we would have to value the collateral securing the debt to determine if it is worthless. See sec. 1.166-2(a), Income Tax Regs.↩ It appears, however, that Nimmo had neither greater nor lesser rights than other creditors in the project (except for Banco de Pais). 17. Respondent does not contend that Nimmo's status changed from debtor to creditor after Windham fled Mexico. Rather, he contends only that Nimmo's status was always that of a creditor and points to no factors converting Nimmo's status. Accordingly, we consider that Nimmo's status remained unchanged throughout. Cf. Cuyuna Realty Co. v. United States, 180 Ct. Cl. 879, 382 F.2d 298 (1967); Tampa & Gulf Coast Railroad Co. v. Commissioner, 56 T.C. 1393 (1971), affd. 469 F.2d 263↩ (5th Cir. 1972).18. Nimmo deducted payments on personal guarantees of loans made to the project in 1964 (and later years). Teachers Finance and First Teachers (in their 1965 fiscal years) wrote off their loans (plus accrued interest) to Windham for use in the projected as bad debts. Even if we were to find that the advances herein created equity interests rather than loans the test of worthlessness would be essentially the same. See Boehm v. Commissioner,326 U.S. 287 (1945), hearing denied 326 U.S. 811 (1946); Austin Co. v. Commissioner,71 T.C. 955 (1979); Morton v. Commissioner,38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320↩ (7th Cir. 1940). We note that deductions for partial worthlessness can be taken with respect to business bad debts; however, neither Teachers Finance nor First Teachers have claimed or established the basis for a deduction due to partial worthlessness. Nor has any petitioner argued in the alternative that the debts became worthless in any later years.19. Petitioners cite Midland Coal Co. v. Commissioner, 1 B.T.A. 311 (1925), in which it was held that the fact that the taxpayer was willing to loan a corporation additional funds after writing off as bad debts previous loans to that corporation did not establish that the debts were not worthless. In that case, however, the corporation was seeking funds for a new project unrelated to the previous project undertaken by the corporation and which had been found to be worthless. Here, additional funds were being invested in the same project. The fact that had additional funds not been forthcoming the project would have been worthless is not relevant where new investments are made and the business is, therefore, saved. In re Park's Estate,58 F.2d 965 (2nd Cir. 1932), cert. den. 287 U.S. 645↩.20. We are aware, of course, that as a preference creditor Putnam Dyes would have a better chance to recover its note against the Mexican corporations than would the general creditors.↩21. Although Bennett was not a party to this proceeding, Goodrich, Dalton was also representing Nimmo in this affair since 1965 and we believe, therefore, that the firm's analysis is entitled to weight even though Bennett's situation is arguably different than Nimmo's. Goodrich, Dalton had been representing Bennett in his attempt to recover his loans to the Mexican corporations even prior to the time it represented Nimmo. ↩22. Green v. Commissioner,T.C. Memo. 1976-127. We discount another letter, however, relied on in part by Nimmo and written in December 1971 from Barth Walker, an attorney who had invested in the project, in which he states the project was worthless in 1964 and 1965. It does not appear that Walker represented any of the creditors in any action to recover their funds of had made the type of investigation necessary before such opinion can be given much weight. This letter simply reflected Walker's opinion (as of 1971). 23. First Teachers, as a cash basis taxpayer, should not have included in income the accrued, but unpaid, interest on the loans to Windham and would not, therefore, be entitled to a bad debt deduction for the accrued interest. Neither party addressed this issue, and since the record is some that unclear as to whether it was included, we treat the accrued interest and principle together.↩24. Petitioner concedes that section 166(f), as in effect during the years in issue, relating to guarantors of non-corporate persons, does not apply and relies only on section 166(d)(1)(B), allowing a deduction for non-business bad debts which become worthless during the year in issue.↩25. We do not necessarily so regard the additional amounts Great States loaned to the Georgia corporations, but which the Georgia corporations did not loan to the Mexican corporations. It is irrelevant at this point.↩26. Although the loans made by Great States indirectly to Nimmo and then by Nimmo to the Mexican corporations may have been ultra vires by Great States, respondent does not contend that this would provide a reason for denying Nimmo the loss, and we do not deal with the question. But see Cooper-Brannan Naval Stores Co. v. Commissioner, 9 B.T.A. 105↩ (1927).27. See sections 1.165-8(a)(2) and 1.165-1(d)(2)(i), Income Tax Regs.↩ Nimmo does not argue or set forth any facts upon which he would be entitled to a partial loss.28. See Rule 146, Tax Court Rules of Practice and Procedure. Petitioner has not introduced any evidence into the record to establish Mexican law, although this Court has discretion to review materials not introduced into evidence under Rule 146↩ in order to determine foreign laws. Respondent first contended that Mexican law applied on brief (not reply brief, as petitioner contends), but we need not decide what, if any, sanctions or alternative actions this Court should apply due to respondent's failure to raise the issue before trial.29. Ill. Ann. Stat. ch. 38, sec. 16-1 (Smith-Hurd) which states in part: Section 16-1. Theft A person commits theft when he knowingly: (a) Obtains or exerts unauthorized control over property of the owner; or (b) Obtains by deception control over property of the owner; or (c) Obtains by threat control over property of the owner; or (d) Obtains control over stolen property knowing the property to have been stolen by another or under such circumstances as would reasonably induce him to believe that the property was stolen, and (1) Intends to deprive the owner permanently of the use or benefit of the property; or (2) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or (3) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit. Windham may have been guilty of "Deceptive Practices" pursuant to Ill. Ann. Stat. ch. 38, sec. 17-1 (Smith Hurd), which states that "A person commits a deceptive practice when, with intent to defraud: (a) He causes another, by deception * * * to execute a document disposing of property or a document by which a pecuniary obligation is incurred * * *." This subsection is intended to cover deceptive practices where either the mental state or act, or both, do not fall within one of the categories specified in section 16-1. "Deception" for these purposes is defined as to "* * * knowingly * * * create or confirm another's impression which is false and which the offender does not believe to be true * * *." Ill. Ann. Stat. ch. 38, sec. 15-4 (Smith Hurd). Under this section, it is not necessary to show that the borrower intended to criminally misappropriate the funds. In any event, petitioner does not contend that section 17-1 applies to this situation, apparently relying only on section 16-1, nor does he address the issue of whether the lesser intent required under section 17-1 constitutes a theft loss for purposes of section 165(c)(3) even though not a theft under Illinois law. Cf. Ander v. Commissioner,47 T.C. 592 (1967). Accordingly, we do not reach this issue.30. As noted previously, Nimmo had guaranteed the loans which the Georgia corporations made to the Mexican corporations and paid these amounts. The record is unclear but the guarantees in issue here apparently relate to the loans made by Great States to the Georgia corporations which were not in turn loaned to the Mexican corporations. ↩31. After the corporations sold the properties which had secured the Great States mortgages they had no other assets (since they had been formed only as holding companies to obtain the mortgages) with which they could pay off their remaining obligations on the notes. In this regard, see section 1.166-6(a)(1), Income Tax Regs.↩32. To the extent all the loans from Great States to the Georgia corporations should be viewed as loans to Nimmo from Great States (and not just the amounts loaned from the Georgia corporations to the Mexican corporations), these amounts would properly be considered only a repayment of loans and neither deductible as a bad debt nor properly considered a contribution to capital. However, since the Mexican corporations were worthless, Nimmo would then be entitled to a bad debt loss in 1968 in the amount claimed here. ↩33. See also Liberty National Bank & Trust Company v. Commissioner,T.C. Memo. 1979-74↩, on app. (10th Cir. July 23, 1979).34. On brief, Nimmo asked for a $60,000 increase in his adjusted basis to reflect the costs but it is unclear how he arrived at this amount; in any event, since only $49,166.01 was not deducted or otherwise reimbursed, we deal only with this amount. ↩35. Respondent again relied solely on the presumption attached to the notice of deficiency. ↩36. An adjustment for the $500 deducted but reimbursed and not included in income should be made (see discussion of the issue of "interest income of $500 from State Security," infra↩).37. On reply brief, Nimmo, in response to respondent's contention that the issue was abandoned, simply directed our attention to that part of his brief in which he discussed the Monroe de Mexico transaction.↩38. Apparently, Nimmo believed a direct loan would violate Illinois law, which makes it a felony for a director or shareholder of an insurance company to cause the company to loan himself money (with certain exceptions). Respondent makes no allegations in this respect, however. See Ill. Ann. Stat. ch. 73, sec. 736.2 (Smith Hurd).↩39. See Arthur R. Jones Syndicate v. Commissioner, 23 F.2d 833 (7th Cir. 1927), revg. on another ground 5 B.T.A. 853 (1926), in which it was held that a taxpayer who borrows money at a usurious rate of interest is entitled to deduct the interest payments. Cf. Oxford Development Corp. v. Commissioner, T.C. Memo. 1964-182. In that case, we held that it was not proper for respondent to question whether or not the making by the corporation-taxpayer of the loans in question and the payment of interest thereon were ultra vires in determining whether the taxpayer was entitled to deduct the interest payments on the loan made by the corporation. Cf. also Olean Times Publishing Co. v. Commissioner, 42 B.T.A. 1277 (1940). Cooper Brannan Naval Stores Co. v. Commissioner, supra. But cf. Mountain State Steel Foundaries, Inc. v. Commissioner, T.C. Memo. 1959-59,' revd. 284 F.2d 737 (4th Cir. 1960). In that case, a corporation redeemed certain of its shares of stock and issued promissory notes in payment to its shareholders. The corporation paid the shareholders interest on these notes. We found that the redemption was contrary to west Virginia law which prohibited a corporation from making the redemption if it impaired its capital. We then disallowed the deduction for interest. On appeal, the Fourth Circuit held that the redemption met the requirements of West Virginia law and was valid. We do not believe under these facts Nimmo could resist demand for payment even if Great States had no authority to make the loan nor does respondent so contend. Cf. Ill. Ann. Stat. ch. 73, sec. 1053 (Smith Hurd); Schipper v. Block & Kuhl Co.,238 Ill. App. 486 (1936); Kadish v. Garden City Equitable Loan & Bldg. Assn.,151 Ill. 531, 38 N.E. 236↩ (1894).40. Respondent does not make any argument that we should distinguish between the $1,250 which Perlman was to contribute and which Nimmo contributed in lieu thereof, although, arguably, this amount should be treated as a loan by Nimmo to Perlman.↩41. The fact that both Nimmo in 1965 and Rule in 1968 reported the sale of stock on their respective income tax returns is not determinative. A taxpayer's return is a self-serving declaration and has little or no probative value absent proof of the surrounding circumstances. Watab Paper Co. v. Commissioner, 27 B.T.A. 488, 506 (1932); Williams v. Commissioner, T.C. Memo. 1978-306; Goodman v. Commissioner, a Memorandum Opinion of this Court dated Dec. 18, 1946, affd. sub nom., Heyman v. Commissioner, 176 F.2d 389 (2d Cir. 1949), cert. den. 338 U.S. 904↩ (1949).42. Cf. Speca v. Commissioner, T.C. Memo. 1979-120, on app. (7th Cir. Aug. 30, 1979).43. Respondent notes that the reported gain had no tax effect because a sufficient amount of deductions were otherwise claimed to offset the entire income derived from the sale.↩44. An informal accounting was kept by Nimmo. Rule actually repaid Nimmo more than he originally borrowed, but an adjustment was later made.↩45. Presumably, in the case of Teachers Finance (an accrual basis taxpayer), this is because the collection of this interest was doubtful. See Clifton Mfg. Co. v. Commissioner, 137 F.2d 290 (4th Cir. 1943); Corn Exchange Bank v. United States, 37 F.2d 34 (2d Cir. 1930); Atlantic Coast Line Railroad Co. v. Commissioner, 31 B.T.A. 730↩ (1934). It is unclear under what theory the interest could be charged to First Teachers, a cash basis taxpayer.46. Nimmo testified at trial that the revenue agent did not go over his records with regard to the basis on audit, and he argues that the determination is, therefore, arbitrary. If respondent, without having determined that a taxpayer's books and records are inadequate, ignores those books and records even though the taxpayer is willing to provide them to him, it may be that he has been arbitrary, especially in those situations in which the deficiency arises not out of a disallowed deduction, a matter of legislative grace, but out of an adjustment to basis. Cf. Chaum v. Commissioner, 69 T.C. 156 (1977). We do not decide this issue. In his petition, Nimmo argued that respondent was arbitrary in that he failed to consider relevant evidence adduced at the prior criminal tax trial involving these same transactions. This argument was not made on brief, however, and we do not consider the argument which was made on brief, that respondent did not go over his records, to be timely raised. Respondent was not apprised of petitioner's argument prior to trial, and, therefore, did not introduce any evidence (which presumably would have been the revenue agents' testimony) to contradict Nimmo's testimony or to otherwise show how the deficiencies were determined. If the taxpayer wishes to place the burden of going forward with evidence on the respondent, Helvering v. Taylor, 293 U.S. 507 (1935), we believe he must at least inform respondent of the grounds upon which he relies. Neither respondent nor petitioner should be allowed to profit by a contention made after trial based upon a failure of proof of a fact which was not, in any practical sense, put in issue by the pleadings. Cf. Markwardt v. Commissioner, 64 T.C. 989 (1975); Theatre Concessions, Inc. v. Commissioner, 29 T.C. 754 (1958); Rule 31(a), Tax Court Rules of Practice and Procedure.↩47. On brief, Nimmo argues that Teachers Finance reported interest income from Nimmo only as it was actually paid. The record is silent on this contention and as noted above, Teachers Finance as an accrual taxpayer would report interest as it was earned, not as it was paid.↩48. The adjustment in the notice of deficiency relating to the annuity income of $250 in 1966 was due to respondent's determination that Nimmo overstated the cost of his annuity by $250. On brief, respondent states Nimmo conceded the retirement fund issue; petitioner, on reply brief, states only that he "denies this $82 issue."49. Respondent states that Nimmo conceded the issue, while Nimmo, on reply brief, states he did not. But this is the extent of the discussion.↩50. See discussion of issue of dividends from Teachers Finance.